STATE OF MISSOURI, on the Information of JOHN M. DALTON, Attorney General, Relator, v. LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF KANSAS CITY, MISSOURI, and the CITY OF KANSAS CITY, Respondents, No. 44390—270 S. W. (2d) 44.

Court en Banc, July 12, 1954.

Opinion Modified, July 28, 1954.

*John M. Dalton,* Attorney General, and *Robert R. Welborn,* Assistant Attorney General, for relator.

*Charles M. Blackmar, Charles B. Blackmar* and *Blackmar, Newkirk, Eager, Swanson & Midgley* for Land Clearance for Redevelopment Authority of Kansas City, Missouri; *David M. Proctor,* City Counselor, and *Dorothy F. Fardon,* Assistant City Counselor, for City of Kansas City, respondents.

978

HOLLINGSWORTH, J.—This is an original information in quo warranto brought by the Attorney General against respondent Land Clearance for Redevelopment Authority of Kansas City, hereinafter referred to as "Authority", and against respondent City of Kansas City, hereinafter referred to as "the City". The information challenges the constitutionality of the Land Clearance for Redevelopment Authority Law (Laws of Missouri, 1951, pages 300-323; 1953 Cum. Supp., RSMo 1949, §§ 99.300 through 99.660, V.A.M.S.) and also challenges the legality of various activities of respondents which have been taken or are planned pursuant to said Law.

The case has been submitted on a stipulation of all essential facts, together with the admissions contained in the pleadings. The admitted facts are:

Under Title I of the Federal Housing Act of 1949 (P. L. 171, 81st Congress, 42 U.S.C.A. § 1451, et seq.), federal financial assistance to state and local governmental units is authorized. That Act provides that cities and other governmental units may apply to the Federal Housing and Home Finance Administration for loans, cap-

ital grants and advances for the purposes of planning projects for redevelopment of blighted and insanitary areas, for the acquisition of land, for the demolition of existing structures thereon, and for the making of site improvements. That Act also provides that after these things have been done, the land so acquired may be sold or leased for various private uses and that if such sale is at a loss the Federal Government will bear two-thirds of the loss and the participating local governmental unit one-third.

Since the adoption of the Federal Act the City has applied for various loans, grants, and advancements from the Federal Government. By Resolution No. 13817, adopted June 20, 1950, the City applied for and obtained a reservation of federal funds for capital grants. Said resolution contains an undertaking by the City to observe the requirements of federal law, to appropriate and allocate funds and to cooperate with the federal authorities. At various times since June, 1950, the City has made other ██ applications, containing undertakings substantially similar to that contained in said resolution.

Pursuant to the terms of the Land Clearance for Redevelopment Law here in question, the City, on November 21, 1952, adopted Ordinance No. 16120, which declared the existence of blighted or insanitary areas within the corporate limits of the City, activated respondent Authority, and approved the exercise by Authority of all duties, powers, and functions authorized under the Law. Thereafter, the mayor duly appointed five commissioners, as required by the Law.

On or about May 15, 1953, the City authorized and approved by Ordinance No. 16613 a contract of novation executed between the City and Authority, by the terms of which certain contracts previously made by the City on account of redevelopment were transferred from the City to Authority, and Authority assumed responsibility for the performance thereof.

Authority, acting through the aforesaid commissioners, has caused public money to be expended for the survey of various areas in the City, which are claimed to be blighted or insanitary areas, has caused plans to be developed for the clearing and redevelopment of such areas and, unless ousted and prevented from so doing, Authority will continue to expend public moneys for such purposes in the future.

On or about June 19, 1953, the City Council adopted Resolution No. 16786, finding and declaring a certain area in the City, located generally between Missouri Avenue and Ninth Street and between Main Street and Baltimore Avenue in downtown Kansas City, referred to in the record as the ''Northside Area'', to be a ''blighted or insanitary area''. (Prior thereto, on February 13, 1953, the City Council had adopted Ordinance No. 16352, approving a contract for final planning of the redevelopment of said Northside Area.)

Authority prepared and approved, by resolution of its commissioners dated July 6, 1953, a redevelopment plan for the aforesaid Northside Redevelopment Project and submitted same to the City Council. The plan was approved by the City Plan Commission and public hearings thereon, upon notice, were held by the City Council as provided by law. By Ordinance 16911 adopted September 4, 1953, the City Council approved the plan. On January 29, 1954, following approval by Authority and the City Plan Commission, and after notice and public hearings before the City Council, certain amendments to said plan were approved by the City Council in Ordinance No. 17451. By the terms of said redevelopment plan, Authority proposes to remove many buildings and structures located in said area and proposes to acquire said buildings and other land adjacent thereto by means of eminent domain, if unable to purchase said land from the owners thereof, and will so acquire said property unless ousted herein. Following acquisition of said land and the demolition of existing structures thereon, Authority proposes to sell and transfer and, unless ousted, will sell and transfer said land to private individuals or corporations for the purpose of constructing parking facilities to be operated by the purchaser of said land as a business for profit, and for the operation of other private or commercial enterprises, which sale may be at less than the cost of acquisition and demolition, thus involving a loss which will be borne in whole or in part by the City.

In the area covered by the aforesaid redevelopment plan, there is a building located at Ninth Street between Main and Delaware Streets, known as the Kay Hotel, which is of sound brick construction and not insanitary, blighted, unsafe, obsolete, dilapidated or dangerous, and there may be other sound structures in the said area. There is also a parcel of vacant land in said area located between Main and Delaware Streets on the south side of Seventh Street, approximately 24 feet in width and 110 feet in depth, being further described as Lot 26, Ross and Scarritt's Addition, which lot is not inherently insanitary or dangerous to health, safety and morals.

The real estate containing the Kay Hotel and the parcel of vacant land above described were acquired by respondent Authority by purchase from the owners thereof and no eminent domain proceedings are contemplated to acquire these properties. Authority, however, claims that under the constitution and statutes it has the right to acquire land containing sound structures and vacant land, when located in a blighted or insanitary area for which a redevelopment plan has been approved, and to utilize the existing structures thereon as a part of the redevelopment plan, or to remove such structures from the land, when such action is necessary to the effectuation of the plan.

Respondent Authority, unless ousted, will propose other redevelopment plans and undertake same, and respondent City will participate

in these other plans and will expend money and furnish services in aid thereof.

On August 5, 1952 the electors of the City authorized the City to become indebted in the amount of $1,500,000 for redevelopment purposes. The City proposes to expend this amount and other city funds in aid of Authority and in furtherance of the redevelopment project hereinabove mentioned and other redevelopment projects promoted and carried on by respondent Authority, and for the purpose of contributing one-third of the cost of losses occasioned by the carrying out of redevelopment projects.

Space will not permit a comprehensive digest of all of the provisions of the Land Clearance for Redevelopment Law. We shall here set forth such of them as will demonstrate its general scheme. Others will be mentioned when necessary to a discussion of the issues.

Section 99.310 declares that there exists in localities throughout the state blighted and insanitary areas (as herein defined) which constitute a growing menace, injurious and inimical to the public health, safety, morals, and welfare of the residents of the state; that such areas contribute to the spread of disease and crime and necessitate large expenditures for the preservation of health and safety, crime prevention, etc.; that this menace is beyond remedy and control in the exercise of the police power; that the elimination of such conditions, the acquisition and preparation of land in or necessary to the development of such areas and its sale or lease for redevelopment in accordance with general plans, which may be given by any public body in connection therewith, are public uses and purposes for which public money may be expended and private property acquired; and that the necessity in the public interest for the provisions thereinafter enacted is declared as a matter of legislative determination.

Section 99.320, in subsection (1), defines "Authority" or "Land Clearance for Redevelopment Authority" to mean a public body, corporate and politic; defines, in subsection (10), "Insanitary area" to mean "an area in which there is a predominance of buildings or improvements (or which is predominantly residential in character), and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime, and is detrimental to the public health, safety, morals or welfare"; defines, in subsection (11), "Blighted area" to mean "an area (other than an insanitary area) which by reason of the predominance of defective or inadequate street layout, insanitary or unsafe conditions, deterioration of site improvements, improper subdivision or obsolete platting, or the existence of conditions which en-

danger life or property by fire and other causes, or any combination of such factors retards the provision of housing accommodations or constitutes an economic or social liability or a menace to the public health, safety, morals, or welfare in its present condition and use.''

Section 99.330, supplemented by Section 99.320, provides for the creation of a Land Clearance For Redevelopment Authority in ▮ each municipality in the state. In municipalities having more than 75,000 inhabitants, the city council may bring the Authority into existence simply by passing an ordinance finding that blighted or insanitary areas exist within the community. Section 99.340 provides that on the adoption of the ordinance, the mayor shall appoint commissioners and prescribes their qualifications.

Section 99.410 provides that a resolution of city council declaring that there are blighted or insanitary areas is to be taken as conclusive of the legal existence of the Authority in a city of more than 75,000 and empowers it to exercise the duties therein imposed upon it. Section 99.420 gives the Authority power, among many others, to acquire land or any interest therein by purchase or eminent domain, including fee simple title, for purposes of a redevelopment project; to clear and prepare such land, and to retain, sell or lease such land for residential, commercial, industrial, recreational or public purposes to a redeveloper, whether it be a public agency or private enterprise, with such restrictions as the Authority may deem necessary to effectuate the purposes of the law. Section 99.430 sets forth the procedure with regard to a redevelopment plan.

Section 99.450 provides that the sale of any property acquired by Authority shall be at fair value, even though such value is less than the cost of planning, acquisition and demolition of existing structures. Authority is permitted to enter into a contract with a private individual for redevelopment in accordance with a redevelopment plan and must give public notice and invite proposals for such contracts. The contract must be approved by the city council.

Section 99.480 and sections following provide that the Authority is authorized to issue bonds, by vote of the commissioners. Section 99.500 provides that the bonds not be obligations of the state or city. These sections also provide that such bonds are to be payable solely out of funds received by the Redevelopment Authority and declare such bonds to be for an essential and governmental purpose.

Section 99.600 provides that the city is authorized to grant funds and to issue bonds of the type and in the manner prescribed by the Act for aiding the work of the Redevelopment Authority.

Section 99.630 provides that the city council is authorized to transfer to the Redevelopment Authority any functions previously performed by the city on redevelopment projects.

The Northside Project, which respondent Authority proposes to

put into operation, shows that it conforms to the basic scheme of the Act.

The charges levelled against the constitutionality of the Law here in question are seven in number. We will consider them in the order presented in the briefs.

### Point I

Relator contends that said Law authorizes the acquisition through eminent domain of private property for private use and that respondent Authority contemplates so acquiring private property for private use, in violation of Article I, §§ 26 and 28, of the Constitution of Missouri, and of the Fourteenth Amendment to the Constitution of the United States.

Article I, § 26, of the Constitution, forbids the taking of private property for public use without just compensation. Article I, § 28, provides: "That private property shall not be taken for private use with or without compensation, unless by consent of the owner, [exceptions not here material]; and that when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." It is also a violation of the Fourteenth Amendment of the Federal Constitution for a state to take private property for a private use. Missouri Pacific Railway Co. v. Nebraska, 164 U.S. 403, 17 S.Ct. 130.

Within recent years the appellate courts of some fifteen of our sister states and the ██ District of Columbia have upheld one phase or another of slum clearance and redevelopment laws. The appellate courts of two states have held them unconstitutional. Those upholding such laws do so on the ground that blighted and insanitary areas in the state constitute a menace to public health, safety, morals and general welfare, and that the acquisition and redevelopment of such areas constitute the taking of private property for public use. The constitutions of all states forbid generally the taking of private property for private use without the consent of the owner. The two states denying the constitutionality of such acts, Georgia and Florida, do not deny that the existence of blighted or insanitary areas is a menace to the general welfare, but they disapprove of the constitutionality of the laws enacted in their states on the ground that the redevelopment of such areas as contemplated by the acts under consideration constitutes a private as distinguished from public use.

The provisions of Article I, §§ 26 and 28, were carried forward from our Constitution of 1875 into our new Constitution of 1945, in which latter document is incorporated a new section which must be read and construed in connection with the aforesaid provisions. No similar provision is found in the constitution of either of the states that have disapproved slum clearance laws. The new provision is Article VI, § 21, as follows: "Laws may be enacted, and any city or

county operating under a constitutional charter may enact ordinances, providing for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas, and for recreational and other facilities incidental or appurtenant thereto, and for taking or permitting the taking, by eminent domain, of property for such purposes, and when so taken the fee simple title to the property shall vest in the owner, who may sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest.''

As early as 1923, in the case of In re Kansas City Ordinance No. 39946, Kansas City v. Liebi, 298 Mo. 569, 252 S.W. 404, 407, this court stated: ''Two different theories are presented by the judicial attempts to describe the subjects to which the expression (public use) would apply. One theory of 'public use' limits the application to 'employment', 'occupation'. A more liberal and more flexible meaning makes it synonymous with 'public advantage', 'public benefit'.'' And at page 409, the opinion further states: ''An examination of cases in this state will show this court is inclined to a more liberal application of the term 'public use'.''

In 1939, the State Municipal Housing Authorities Law (§§ 99.010-99.230, RSMo 1949, V.A.M.S.), very kindred in its purpose and effect to the Act here under consideration, came before this court in the case of Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S.W. 2d 65. It was there held that the Housing Authority, organized under the Act for the purpose of clearing slums and erecting and maintaining low-cost housing, was a municipal corporation with governmental functions for public purposes, and that the remedial purposes of the Act would be presumed to be ''public purposes'' unless it clearly appeared they were not in harmony with the provisions of the Constitution; and further held that the concept of ''public use'' was never to be taken as static, but should be applied and construed as made necessary to the public welfare by changing conditions. To the same effect are the cases of Bader Realty & Investment Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W. 2d 489; St. Louis Housing Authority v. City of St. Louis, 361 Mo. 1170, 239 S.W. 2d 289.

Relator contends that the Housing Law and housing cases are distinguishable from the Land Clearance for Redevelopment Law and the instant case, in that the areas authorized to be taken by eminent domain under the Housing Law and the cases decided thereunder are to be used by the Authority for the construction of modern, sanitary and low-cost housing; whereas, in the instant case the property proposed to be taken and cleared of its blighted and insanitary condition is ultimately to be sold to private interests. Relator's position is that this amounts to a direct flouting of the principle that private property cannot be taken for private use without the

consent of the owner; and that even though Section 99.310 of the Law declares that the acquisition of real estate in blighted and insanitary areas for purposes of redevelopment, such as is contemplated by the plan here under consideration, is a public use, yet, under Article I, § 28, of the Constitution, the question whether a use is public can be determined only by the judiciary.

Relator further says that Article VI, § 21, "is silent as to whether the end-use of land so taken must be a public use", and that since "Article I, § 28, sets forth specific exceptions, such as ways of necessity and sanitary ditches, and allows the taking of private property for private use in these exceptional situations, it can be fairly inferred that the framers of the Constitution inferred that all other exercise of the power of eminent domain be for a public use, and that Article VI, § 21, should not be read as an exception to Article I, § 28."

Under the Redevelopment Law, private owners come into the picture only after the land has been acquired and cleared. There may then be a sale to a redeveloper, who must proceed according to the plan. Only after completion of the redevelopment plan is there anything like unencumbered private ownership, and even at this point there may be restrictions in the form of covenants running with the land. After the completion of redevelopment, the retention of fee title by the public authorities may be no longer necessary to the accomplishment of the essential public purpose. Since the purpose has then been accomplished, the sale to private interests is purely an incident of the main program. Nothing in the Constitution or statutes requires that public ownership be continued for a longer time than is necessary to the accomplishment of the public purposes which give rise to the taking.

The very fact that Article VI, § 21, is silent as to the use to which the land may be put after it is cleared of its blighted and insanitary condition and sold, "*subject to such restrictions as may be deemed in the public interest*" (emphasis ours), conveys, we think, the definite assumption that the primary object and public purpose of the law shall be the clearance and correction of any duly declared blighted and insanitary condition, and that thereafter the area may be sold with or without restrictions to a private enterprise, as may be deemed by Authority to be in the public interest.

A vexing question is whether Article VI, § 21, constitutes an exception to Article I, § 28, which declares that the question whether the contemplated use of property sought to be taken by the processes of eminent domain shall be judicially determined without regard to any legislative declaration that the use is public. On the other hand, Article VI, § 21, in express terms, unqualifiedly authorizes the legislature and cities and counties operating under constitutional charters to enact legislation providing for the taking of blighted and insanitary areas by eminent domain.

988

In discussing an analogous situation, the Court of Appeals of New York, in the case of Kaskel v. Impellitteri, 306 N.Y. 73, 115 N.E. 2d 659, 662, said: "However, the situation here actually displayed is one of those as to which the Legislature has authorized the city officials, including elected officials, to make a determination, and so the making thereof is simply an act of government, that is, an exercise of governmental power, legislative in fundamental character, which, whether wise or unwise, cannot be overhauled by the courts. If there were to be a trial here and the courts below should decide in favor of plaintiff, there would be effected a transfer of power from the appropriate public officials to the courts. The question is simply not a justiciable one." In the case of Schenck v. City of Pittsburgh, 364 Pa. 31, 70 A. 2d 612, the Supreme Court of Pennsylvania held, as concisely stated in the syllabus: "In absence of any indication that city planning commission did not act in good faith or was wholly arbitrary in certifying the area designated by it as blighted within meaning of Urban Redevelopment Law, its certification to that effect was not subject to judicial review."

In determining the question thus posed, we think we must, if possible, give effect to both Article I, § 28, and Article VI, § 21. And we must take into consideration the Fourteenth Amendment to the Constitution of the United States. In the case of Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 362, the court said that "in considering the application of the Fourteenth Amendment [to the Constitution of the United States] to cases of expropriation of private property, the question what is a public use is a judicial one." The opinion in that case further states, however, that: "In deciding such a question, the court has appropriate regard to the diversity of local conditions and considers with great respect legislative declarations and in particular the judgments of state courts as to the uses considered to be public in the light of local exigencies."

Prior to the adoption of our new Constitution, in which for the first time appeared the broad powers granted the legislative branch as set forth in Article VI, § 21, we had held in the Laret case, supra, that a finding and declaration as to the need of public housing would be entitled to great weight, and that the courts would presume the declared purposes "public purposes" unless it clearly appeared they were not in harmony with the constitution. (It was held they were in harmony.) Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S. W. 2d 65.

We hold that Article I, § 28, and Article VI, § 21, considered together and in the light of the above cited cases, mean that final determination of the question whether the contemplated use of any property sought to be taken under the Law here in question is public rests upon the courts, but that a legislative finding under said law that a blighted or insanitary area exists and that the legislative agency

proposes to take the property therein under the processes of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears upon allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith. Bradford v. Phelps County, 357 Mo. 830, 210 S.W. 2d 996, 1000.

### Point II

Relator contends that Authority's proposal to sell the real estate within the blighted area to private redevelopers at a price less than the cost of acquisition, demolition and improvement, as is provided in Section 99.450(1), constitutes the giving of special privileges, the lending of public credit and the granting of public property in aid of a private person, association or corporation in violation of Article III, §§ 38(a) and 39, and Article VI, §§ 23 and 25.

Admittedly, Authority proposes to acquire title to certain land in the Northside Redevelopment Area. The existing structures thereon will be demolished. Extensive site improvements will be made. The land will then be sold at its "fair value" at the time it is sold for the uses contemplated in the redevelopment plan. It does seem virtually certain, therefore, that a loss will ensue.

Relator says that this procedure, financed in part by the issuance of $1,500,000 of bonds, is essentially a scheme and plan whereby one man's property will be transferred to another at a cost less than the commercial cost, and that Authority and the other governmental authorities participating in the project are in effect subsidizing private enterprise, citing in support thereof Adams v. Housing Authority of Daytona Beach, Fla.Sup., 60 So. 2d 663, which does hold that such a project violates provisions of the Florida Constitution that are essentially similar in purpose and effect to the portions of our Constitution above cited. (Relator also cites the following Missouri cases: Webb v. Lafayette County, 67 Mo. 353; State ex rel. Public Water Supply District v. James, 361 Mo. 814, 237 S.W. 2d 113; State ex rel. Board of Control v. City of St. Louis, 216 Mo. 47, 115 S.W. 534. They are not in point.)

It would be difficult to imagine a workable law that exacted more from a purchaser than a "fair value" price. An exaction that the purchaser pay fair value cannot conceivably amount to a grant or subsidy. Both the statute and the undertakings of respondents pursuant thereto so clearly demonstrate that the purpose in acquiring the land is to rid it of its blighted and insanitary condition and to thereafter convey it to redevelopers for conversion to useful purposes in accordance with the redevelopment plan. The great weight of authority is that there is no private grant when land is cleared for the purposes herein contemplated and is thereafter sold at a loss, but for

its then fair value. Rowe v. Housing Authority of Little Rock, 220 Ark. 698, 249 S.W. 2d 551, 553; Redevelopment Agency of San Francisco v. Hayes, Cal.App., 266 P. 2d 105, 125; Ajootian v. Providence Redevelopment Agency, R.I.Sup., 91 A. 2d 21, 26; Gohld Realty Co. v. City of Hartford, Conn., 104 A. 2d 365. 372; Foeller v. Housing Authority of Portland, 198 Ore. 205, 256 P. 2d 752, 767. In all of these cases it is pointed out that the primary purpose of a redevelopment project is a public purpose, and that any benefits to private individuals are merely incidental to the public purpose. To the same effect is Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S.W. 2d 65. See also: Jasper County Farm Bureau v. Jasper County, 315 Mo. 560, 286 S.W. 381; State ex rel. Kansas City Insurance Agents' Association v. City of Kansas City, 319 Mo. 386, 4 S.W. 2d 427.

Bonds voted by Authority, payable solely out of receipts, are expressly authorized by § 99.480. The funds realized from their sale, and from the sale of the bonds voted by the city, will be public funds, to be expended only by a public agency for a public use.

We hold that the statute and the procedure followed and proposed to be followed by respondents, as herein set forth, do not violate the constitutional provisions hereinabove set forth under Point II.

## Point III

■ Relator contends that to the extent the statute purports to authorize acquisition of sound structures and vacant land, it authorizes the taking of private property for private use without the consent of the owner in violation of Article I, § 28, of the Constitution of Missouri, and the Fourteenth Amendment to the Constitution of the United States.

Admittedly, Authority claims the right to use the power of eminent domain to acquire sound structures and vacant land, if any there be, in the redevelopment of other areas found to be blighted or insanitary.

The purpose of the Act, as declared by the Legislature, is the clearance and redevelopment of blighted and insanitary *areas* that constitute a menace to public health, safety, morals and welfare. To insure effective redevelopment of such an *area*, it probably would be necessary in certain instances to acquire buildings or vacant land which, but for being within the area, would not be blighted or insanitary. To deny Authority the power to acquire such buildings or vacant land could and in many instances would defeat the very purpose of the legislation, to wit: the clearance and redevelopment of blighted and insanitary *areas*, as distinguished from individual properties.

Apparently all of the courts that have considered this phase of the Act have held that sound structures and vacant land may be acquired when located within the blighted or insanitary areas. See

Herzinger v. Baltimore, Md.App., 98 A. 2d 87, 94; Oliver v. City of Clairton, 374 Pa. 333, 98 A. 2d 47, 52; State ex rel. Bruestle v. Rich, 159 Ohio St. 13, 110 N.E. 2d 778, 790; Gohld Realty Co. v. City of Hartford (Conn.), 104 A. 2d 365, 371.

Relator relies upon certain observations made in the course of the opinion in Schneider v. District of Columbia, 117 F. Supp. 705, but the conclusion ultimately reached in the opinion is in accord with the cases cited above.

We are convinced and hold that the Act here in question does not offend against Article I, § 28, or the Fourteenth Amendment to the Constitution of the United States, on the ground assigned in Point III.

## Point IV

 Relator contends that the clearance of blighted and insanitary areas is a subject separate and distinct from the redevelopment of areas which have been cleared, and that the inclusion of both of these subjects in the same legislative act violates Article III, § 23, of the Constitution of Missouri, which, insofar as here pertinent, provides that "no bill shall contain more than one subject which shall be clearly expressed in its title."

No purpose would be served by inclusion of the title to the Act in this opinion. It may be found in the Laws of Missouri, 1951, page 300.

The above constitutional provision "requires that matters which are incongruous, disconnected and without natural relation to each other must not be joined in one bill, * * *. It does not prevent the inclusion in one bill, under one general title, of subjects naturally and reasonably related to each other." Edwards v. Business Men's Assurance Co., 350 Mo. 666, 168 S.W. 2d 82, 93. See also Spitcaufsky v. Hatten, 353 Mo. 94, 182 S. W. 2d 86, 111, 160 A.L.R. 990. In the case of Foeller v. Housing Authority of Portland, 198 Ore. 205, 256 P. 2d 752, 776-777, the identical contention here made was urged upon the court. The court denied its validity, stating: "The interpretation of the act and its purposes * * * renders inevitable a conclusion by us that the act contains only one subject; that is, the revitalization of blighted areas."

The Law here in question deals with one general subject matter and has one purpose: the eradication and redevelopment of blighted and insanitary areas. The Legislature evidently believed the problem would not be finally solved by mere clearance of the areas, that a redevelopment scheme should be provided calculated to prevent a recurrence of the condition. Consequently, the redevelopment of such areas after they are cleared is but one phase of a comprehensive plan designed to insure an efficient and lasting solution of the problem.

The cases cited by Relator are readily distinguishable. They are: Witzmann v. The Southern Ry. Co., 131 Mo. 612, 33 S.W. 181; Vice v.

Kirksville, 280 Mo. 348, 217 S.W. 77; Berry v. Majestic Milling Co., 284 Mo. 182, 223 S.W. 738.

The contention made by Relator in Point IV is denied.

## Point V

■ Relator contends that the provisions of the Act authorizing the city council and Authority to determine that certain areas are blighted or insanitary and that the land therein should be acquired violate the federal and state constitutions in that: (a) There is an improper delegation of legislative power to respondent Authority in permitting it to determine what areas are to be the subject of redevelopment plans, contrary to Article II, § 1, of the Constitution of Missouri; (b) There is no provision for notice to or hearing of the property owners before an area is declared to be blighted or insanitary, nor is notice or hearing required before it is determined that property is to be acquired for purposes of redevelopment, thereby depriving owners of property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States, and Article I, § 10, of the Constitution of Missouri.

■ The argument in support of subpoint (a) is that even though the city council declares a certain area blighted and insanitary and in need of development under § 99.430(2), yet the selection of the particular land to be developed is by the Act made the function of Authority; that there is no compulsion on Authority to prepare such a plan; that there is no precise guide as to how the area is to be redeveloped; that § 99.430(6), in effect, permits Authority to recommend a plan without being required to find any more than that the proposed use is a "good thing" for the community; and that § 99.450 invests Authority with unrestrained power to determine what the "fair value" of land is after it has been cleared, etc., and to determine whose proposal for redevelopment of an area is to be accepted.

Article II, § 1, provides: "The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in instances in this Constitution expressly directed or permitted."

Two cases are cited by Relator as authority for its position. In Merchants' Exchange v. Knott, 212 Mo. 616, 111 S.W. 565, the court held void an Act which authorized the Board of Railroad and Warehouse Commissioners " 'to establish State inspection and weighing of grain at such places or in such territory within the State as in their opinion may be necessary' ", and that " 'all buildings, elevators or warehouses located in any territory wherever State grain inspection and weighing may be established by the State Board of Railroad and

Warehouse Commissioners * * * are hereby declared public warehouses' '', etc., and that '' 'all grain arriving in any territory where State grain inspection may be established by this article * * * shall be inspected and graded by a duly authorized State Inspector' '', because it gave the commissioners the vital power to capriciously say, as their opinion serves, to what places, in what territory and at what times the statute shall apply, or whether or not it shall be in force at any time in any place. In Cavanaugh v. Gerk, 313 Mo. 375, 280 S.W. 51, the court held that a city ordinance creating a traffic council and authorizing it to establish regulations and determine streets to be affected was an. unauthorized delegation of legislative authority, and that regulations adopted by the traffic council were without effect of law until embodied in an ordinance by the city council as contemplated by another section of the ordinance. These cases are readily distinguishable from the situation here involved.

Section 99.430(2) very properly, we think, forbids the acquisition of property for a clearance project until the governing body has duly declared the area blighted or insanitary. The city is granted such power by virtue of the provisions of Article VI, § 21, and the Act here in question. Section 99.430 explicitly prescribes the duties of Authority in the preparation of plans for redevelopment of the area and the many factors it must take into. consideration. The uses to which the land may be put are many but they are not unlimited. They must be in accord with the approved development plan and designed to carry out its purpose, and, more importantly, the plan must be approved by the governing body before it is put into operation. Section 99.390 authorizes the removal of any of the commissioners of Authority by the governing body for any inefficiency, neglect or misconduct in office.

It certainly is an appropriate function of Authority as an administrative agency of the governing body to prepare plans and administer the project as provided in the Act. The case of State on inf. of Wallach v. Loesch, 350 Mo. 989, 169 S.W. 2d 675, seems to be directly in point. The Act there under consideration created a County Planning Commission and prescribed its duties. All of its actions were subject to approval of the county court. It was held ▮▮ that the creation of such a board and investing it with the powers therein enumerated did not constitute an unlawful delegation of legislative power.

Neither can we believe it to be a delegation of legislative power to allow the Authority to sell property within the area at its fair value. The phrase ''fair value'' has a well known meaning. We are cited to no case holding that the determination of value at which public property is to be sold amounts to a legislative function.

We conclude that the powers of Authority, as defined in the Act, including the power to prepare plans, to carry out these plans after

they have received approval of the governing body, and to determine the fair price at which land within legislatively declared blighted or insanitary areas may be sold are administrative details and were properly delegated to Authority as an administrative agency of the governing body. See Ex Parte Williams, 345 Mo. 1121, 139 S.W. 2d 485, 491.

Under subpoint (b), Relator contends, first, that "By Sec. 99.430(2), the City Council has the power to make a legislative finding that a certain area is blighted or insanitary, and in need of redevelopment. There is no opportunity for an owner of land in an area under consideration to appear and seek to show that his property, or the area within which it is located, is not blighted or insanitary. * * * * Perhaps he can appear before the City Council or one of its committees to argue, but, even if granted, this privilege does not constitute judicial due process: * * * * This initial determination, which is an essential condition to any further proceedings for redevelopment, is made without affording the owners affected the right to challenge the sufficiency of the evidence on which the determination is based." Relator cites no case in support of this contention, and we have found none.

The law is clear that when the property is to be used for a public purpose and the taking of property by eminent domain is authorized, the decision of what property is to be taken is a legislative and not a judicial function. State ex rel. State Highway Commission v. Curtis, 359 Mo. 402, 222 S.W. 2d 64, 68, and cases therein cited; Bowman v. Kansas City, Mo. Sup., 233 S.W. 2d 26, 29-30. This contention must be overruled.

Relator, under subpoint (b), also contends: "Nor is there sufficient requirement of notice or hearing, before a redevelopment plan can be finally approved. It is true that the City Council must publish notice of consideration of a redevelopment plan, and must hold a public hearing before the plan is adopted. [Section 99.430(8) and (9)]. This public hearing, however, is purely a legislative hearing, and the only requirement is that 'all interested parties shall be afforded * * * * a reasonable opportunity to express their views respecting the proposed redevelopment plan.' Nothing is said about the right to present evidence, to subpoena witnesses, or to cross-examine. The members of the Council may accept or reject the views presented, as they see fit, for any reason they see fit. Here again there is no record which can be reviewed, and no precise determination of rights."

Again Relator cites no case in support of this contention and we have found none. Admittedly, there was full compliance with § 99.-430(8), which contains a comprehensive method of notice by publication and opportunity to interested parties to express their views.

Evidently, the Legislature believed such a provision would be conducive to a more enlightened determination by the governing body as to the feasibility of any proposed plan; it may be that the provision for such a hearing was inserted more for the benefit of the governing body rather than for the benefit of interested individuals. But, in any event, the Act clearly places upon the governing body the responsibility and exclusive function of determining whether a proposed plan shall be adopted. To hold as suggested by Relator would be an unwarranted judicial interference with a power properly vested, as we have hereinabove ██ determined, in the legislative agency. The contention must also be overruled.

### Point VI

██ Relator contends that Authority has no power under Article VI, § 21, of the Constitution, to acquire fee simple title to property in a blighted or insanitary area by the processes of eminent domain.

As hereinabove stated, Article VI, § 21, provides for the taking of property by eminent domain for the purposes stated therein, "*and when so taken the fee simple title to the property shall vest in the owner, who may sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest.*"

Relator says that the "problem here is the meaning of the word 'owner' as used in the Constitutional provision. It necessarily means either the original owner, or the condemning agency. Respondent Authority must establish the latter meaning if it is to be confirmed in its asserted power of acquiring fee simple title from the original owners, without their consent, and of transferring that title to an entirely different set of owners."

We think the meaning of the provision is so definitely clear as not to admit of argument. The word "owner", of course, refers to the taker, the condemning agency, whether it be a city or county. The purpose of the provision is that the taker shall become invested with the fee simple title in order to enable it to "sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest." And, as hereinabove stated, if the Authority deems it in the public interest, such property may be sold without restriction. The contention is denied.

### Point VII

██ Relator contends that the information and admissions contained in the returns of both respondents show that there is no consideration moving to the City, as required by Missouri Revised Statutes, § 99.580. That section provides: "For the purpose of aiding and cooperating in the planning, undertaking or carrying out of a land clearance project located within the area in which it is authorized to act, any public body may, upon such terms, *with reasonable con-*

*sideration* (emphasis ours), as it may determine: ' * * * *." [Here follows a detailed itemization of a large number of things that may be done in furtherance of the Act.] Typical of these is the power to: "(1) Dedicate, sell, convey or lease any of its interest in any property, or grant easements, licenses or any other rights or privileges therein to an authority; * * * (3) Furnish, dedicate, close, vacate, pave, install, grade, regrade, plan or replan streets, roads, sidewalks, ways or other places, which it is otherwise empowered to undertake; * * * (6) Incur the entire expense of any public improvements made by such public body in exercising the powers granted in this section; (7) Do any and all things necessary or convenient to aid and cooperate in the planning or carrying out of a redevelopment plan; (8) Lend, grant or contribute funds to an authority; * * *."

Respondents tell us that the emphasized phrase, "with reasonable consideration", is peculiar to Missouri, in that no other redevelopment statute contains similar language. Relator concedes that the meaning of the phrase is uncertain, but that its only logical meaning is that the municipality may participate in a project such as this only if it receives some consideration in a legal sense. Respondents say that the "very language of Section 580 shows that this argument is fallacious. Subsections (5), (6), (7), (8) and (9) furnish express authority for Respondent City to do everything which it claims the right to do, as shown by the record. Subsection (8) alone shows that no payment to the City is to be required, by the granting of express authority to the City to grant or contribute funds to Respondent Authority", and suggest it may mean "due deliberation".

Actually, the phrase, when read in connection with the provisions of § 99.580. ▇▇▇ and the other provisions of the Act, has little, if any, meaning in the sense of legal effect. Possibly, it means "in reasonable furtherance of the provisions of the Act". We cannot read into the phrase the meaning and purpose attributed to it by Relator. We hold it does not void the Act, and neither does it affect any of the proceedings here under consideration. The contention is denied.

▇▇▇ Having adversely disposed of all contentions made by Relator, ouster, as prayed, should be and is denied. All concur except *Tipton, J.,* not sitting.