**STATE of Missouri, ex rel. UNITED STATES STEEL and Carnegie Pension Fund, Relator,**

v.

**Hon. Jack L. KOEHR, Judge, 22nd Judicial Circuit, City of St. Louis, Missouri, Respondent.**

No. 73276.

Supreme Court of Missouri, En Banc.

June 11, 1991.

As Modified on Denial of Rehearing July 23, 1991.

Donald U. Beimdiek, Joseph R. Nieman, Ann E. Buckley, St. Louis, for relator.

Sarah A. Siegel, Elaine B. Wright, Gregory R. Smith, Irvin Dagan, Joann M. Tracy, St. Louis, for respondent.

WILLIAM E. TURNAGE, Special Judge.

United States Steel and Carnegie Pension Fund sought a writ of prohibition in the Court of Appeals, Eastern District, to prohibit The Honorable Jack L. Koehr from proceeding with an eminent domain proceeding brought by the Land Clearance for Redevelopment Authority of the City of St. Louis. The court of appeals issued a preliminary order in prohibition and after opinion directed that the order be made permanent. This court granted transfer. The preliminary order in prohibition is quashed.

Land Clearance for Redevelopment Authority of the City of St. Louis (LCRA) is the public agency responsible for fostering and overseeing redevelopment of areas declared "blighted" within the City of St. Louis pursuant to the Land Clearance for Redevelopment Authority Law §§ 99.-300–.715, RSMo 1986.[1]

In February, 1990, LCRA filed a petition in eminent domain to acquire a tract located at Eighth and Locust in the City of St. Louis owned by relator. The tract is used as a surface parking lot and has been for several years. It is irregularly shaped and contains about 25,000 square feet. The

---

**1.** All sectional references are to RSMo 1986, unless otherwise indicated.

tract is located in The Downtown Washington Avenue Redevelopment Area (DWAR).

In 1984, LCRA prepared the redevelopment plan for DWAR. The objective was stated to be the revitalization of Washington Avenue west of the St. Louis Centre Project by restoring many of the existing sites, constructing new buildings and providing support parking facilities. The plan called for rehabilitation of existing structures and new construction for office, retail, hotel, residential and parking uses.

Prior to preparation of the plan, LCRA made a survey of the DWAR area to evaluate the structures located therein with reference to their physical condition, occupancy and use. Based on that survey LCRA recommended that the area be declared blighted. Thereafter, the LCRA board adopted a resolution finding the DWAR area to be blighted, approved the plan, and authorized the executive director to submit the finding of blight to the Community Development Agency of the City of St. Louis (CDA) as required by § 99.430.1(5). CDA recommended approval of the plan and LCRA thereupon submitted the plan to the Board of Aldermen of the City of St. Louis. Pursuant to § 99.430.1(8) the Board caused notice of a hearing of the plan published. In April, 1984, the Board approved the plan.

In 1988, LCRA prepared an amended plan for the DWAR area to include in the plan the authorization for LCRA to acquire property in the area by eminent domain. The amended plan was approved by CDA and was submitted to the Board of Aldermen. The amended plan stated that the DWAR area remained blighted with approximately one-half of the property in the area vacant. The amended plan also stated that with few exceptions property in the area was in poor or fair condition. Public notice was published in a newspaper of hearings on the amended plan before the Board of Aldermen and in July, 1988, the amended plan was approved by the Board by Ordinance No. 60939.

After approval of the plan in 1984 by the Board of Aldermen, the Board of LCRA advertised for redevelopers for the DWAR area. The Board thereafter entered into an agreement with the Washington Avenue Redevelopment Corporation, a private redevelopment corporation, established pursuant to chapter 353. The redevelopment agreement provides that the redeveloper will construct, or cause to be constructed, improvements within the redevelopment area in accordance with the DWAR plan. Any developer desiring to undertake construction on any parcel in the redevelopment area could only do so through agreement with the redeveloper and pursuant to the terms of the redevelopment agreement. The redeveloper entered into an agreement with Eighth & Locust Associates (Associates) by which Associates undertook the redevelopment of the Mayfair Hotel,[2] which is located within the DWAR area. The agreement between the redeveloper and Associates provided that the Mayfair would be developed in accordance with a parcel development agreement, which required LCRA approval of Associates design and construction plans for the hotel.

It was decided that the parking lot owned by relator was essential to the redevelopment of the Mayfair because it was located adjacent to the Mayfair. Following an unsuccessful attempt to acquire relator's parking lot by negotiation, LCRA filed a petition in eminent domain in February, 1990, against relator. Prior to a hearing on the petition, relator filed a motion to dismiss alleging that its property was being condemned for a private use, that it had not been given notice of the hearings before the Board of Aldermen and that the finding of blight by the Board of Aldermen was arbitrary. The court held a hearing on the petition at which the facts above stated were adduced. In addition, there was evidence that Associates would not have undertaken the redevelopment of the Mayfair without Associates being able to acquire the ownership of relator's parking lot because the ability to control that lot was necessary to make the redevelopment of

---

**2.** Although the record does not explicitly name Associates as the developer of the Mayfair, the clear inference from all of the evidence is that Associates was the developer.

the Mayfair economically feasible. There was evidence that it was necessary for Associates to have control of relator's lot in order to provide parking for the Mayfair and to provide space for possible expansion of the hotel.

To facilitate the condemnation of relator's lot, LCRA and Associates entered into a letter agreement by which LCRA agreed to acquire relator's property by negotiation or condemnation if necessary. Associates agreed to use relator's lot for surface parking in connection with the Mayfair Hotel until such time as it is economically feasible to expand the Mayfair onto such lot. Associates agreed to reimburse LCRA for the cost of acquiring relator's lot and Associates could request LCRA to abandon condemnation proceedings in the event of an excessive commissioner's award.

Thereafter, LCRA instituted the condemnation proceeding. After hearing evidence, the court overruled the relator's motion to dismiss and the filing of the petition for writ of prohibition in the court of appeals followed.

The court of appeals took the view that because Associates had agreed to reimburse LCRA for the cost of acquiring relator's lot and that such lot would be conveyed to Associates for parking use, the same use which relator made of its lot, that the acquisition was for a private purpose and was therefore not authorized.

■ Prohibition is the proper procedure for relator to challenge the condemnation proceedings in this case because of its contention that the proceedings are unauthorized because acquisition was sought for a private use. If the proceedings are unauthorized, the court lacks subject matter jurisdiction. *Tierney v. Planned Indus. Expansion Auth.*, 742 S.W.2d 146, 149–50[1–3] (Mo. banc 1987).

■ Relator contends that LCRA sought its lot for a private use in violation of Article 1, § 28 of the Missouri Constitution because the decision to bring a condemnation action was based on the agreement between LCRA and Associates by which the property would be conveyed to Associ-

ates. Relator argues that its lot was being used for parking and that Associates would use the lot for parking and therefore the lot was being taken only for the private use of Associates. Article I, § 26 of the constitution forbids the taking of private property for public use without just compensation. Article I, § 28, provides that when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public. The 1945 Constitution adopted Article VI, § 21, which provided:

Laws may be enacted, and any city or county operating under a constitutional charter may enact ordinances, providing for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas, and for recreational and other facilities incidental or appurtenant thereto, and for taking or permitting the taking, by eminent domain, of property for such purposes, and when so taken the fee simple title to the property shall vest in the owner, who may sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest.

In *State ex rel. Dalton v. Land Clearance for Redevelopment Auth.*, 364 Mo. 974, 270 S.W.2d 44, 52[2] (banc 1954), the Court confronted the tension between Article I, § 28, which provides that the question of public use shall be judicially determined, and Article VI, § 21, which authorized the legislature and cities and counties to enact legislation for the taking of blighted areas. The Court resolved the tension between those two provisions in the following manner:

We hold that Article I, § 28, and Article VI, § 21, considered together and in the light of the above cited cases, mean that final determination of the question whether the contemplated use of any property sought to be taken under the Law [§ 99.300–.715] here in question is public rests upon the courts, but that a legislative finding under said law that a blighted or insanitary area exists and

that the legislative agency proposes to take the property therein under the processes of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears upon allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith.

■ The holding in *Dalton* is that the taking of property under the Land Clearance Redevelopment Act is a taking for a public use. This was restated in *Tierney*, 742 S.W.2d at 150[4, 5], when it was stated that "[r]edevelopment of 'blighted, substandard or insanitary' areas is a public purpose." As stated in *Dalton*, once the legislative body finds an area to be blighted, the taking of any tract of land included within the area declared to be blighted is authorized as a taking for a public use. 270 S.W.2d at 53[5]. The declaration of blight declares the public use. This result follows because the clearing and redevelopment of a blighted area is for the public use of revitalizing such area to make it healthful. As *Dalton* held, this declaration is conclusive unless it is shown by clear proof that the finding was arbitrary or was induced by fraud, collusion or bad faith. *Id.*, 270 S.W.2d at 52[2].

Shortly after the decision in *Dalton* the United States Supreme Court decided *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), which held that the taking of property for the purpose of clearing and redevelopment is a public use. It is apparent that the owner of each tract of land in a blighted area cannot be permitted to resist redevelopment programs on the ground that his property is not being taken for a public use. If each property owner were allowed to contest, as relator does here, that his property was being taken for a public use, redevelopment plans for blighted areas would be hopelessly bogged down in a marsh of litigation that could prolong the acquisition of property in the area so long that the redevelopment plan could become useless. This would obviously defeat the purpose of redeveloping blighted areas.

■ In addition, the fact that relator's property is not blighted is irrelevant to the question of public use. *Berman* also held that property may be taken for redevelopment which in and of itself is innocuous and unoffending. The Court justified this conclusion by holding that it is the need of the area as a whole which the legislative body is entitled to evaluate. *Id.* at 35–36, 75 S.Ct. at 103–104. The Court further stated:

> If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly. The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

*Dalton* also held that it may be necessary to acquire buildings or vacant land that are not blighted nor insanitary but to deny the right to acquire those properties when they are within an area declared to be blighted would be to defeat the purpose of the legislation, which is the clearance and redevelopment of blighted and insanitary *areas*. *Id.* 270 S.W.2d at 53[5].

When the Board of Aldermen adopted the redevelopment plan containing the power of eminent domain and declared the DWAR area to be blighted, LCRA was

thereupon authorized to acquire by eminent domain any tract of land within that area. The acquisition of such property is conclusively presumed to be for a public use unless it can be shown by clear proof that the Board acted arbitrarily or was induced to act by fraud, collusion or bad faith. Relator has made no showing that the Board acted arbitrarily or upon an improper inducement. Therefore, relator may not challenge the taking of its property on the ground that the taking is not for public use.

■ In a related point, relator contends the condemnation was improper because the finding of blight was not supported by evidence. The sufficiency of the evidence before a legislative body that led to action to declare an area blighted is not reviewable as it is in cases decided by administrative bodies. As pointed out above, the only ground upon which the finding of blight may be attacked is by clear evidence that the finding was arbitrary or improperly induced. However, without performing a sufficiency review it may be observed that LCRA made a survey of the property in the DWAR area and found about half of the area was vacant, the street plan was defective, and most of the property was in poor or fair condition.

■ Relator also contends that the letter agreement between LCRA and Associates by which Associates agreed to pay the costs of the condemnation and was given the right to request termination of the condemnation proceedings in the event the commissioner's award was excessive, and to convey the lot to Associates, demonstrated that the acquisition was arbitrary and capricious.

In this argument relator does not challenge the finding of blight but contends essentially that the condemnation proceedings were brought so that Associates could obtain relator's lot and that this resulted in a condemnation by a private body for its own private purpose. As pointed out above the public use of relator's lot was established by the adoption of the blighting ordinance. The letter agreement between LCRA and Associates did not amount to the grant of eminent domain power to a private entity. The public use of relator's lot had been established and LCRA was the entity that was required to and did make the decision to acquire relator's lot by condemnation.

■ Relator argues that the sale of its lot to Associates for the same use that relator made of the lot shows that this was a taking for a private use. As already stated, the issue of public use was decided by the declaration of blight by the Board of Aldermen. The agreement to sell the lot to Associates is purely an incident of the main program of developing the DWAR area. *Dalton*, 270 S.W.2d at 51[1]. Further, in *Berman* the Court stated that one of the means chosen for redevelopment was the use of private enterprise. It was argued in that case that the project became the taking of property from one businessman for the benefit of another businessman. But the Court held that the means of executing the project is for the legislative body, and it alone, to determine. 348 U.S. at 33, 75 S.Ct. at 102. Here the means chosen was to contract with a redeveloper who in turn contracted with Associates to redevelop the Mayfair. It is necessary for Associates to control relator's lot for parking and future expansion to make redevelopment of the Mayfair economically feasible. Thus, acquiring relator's lot is necessary for the redevelopment of the Mayfair. This comports with *Dalton* and *Berman*. The agreement between LCRA and Associates does not show the lot was acquired for a private use.

■ Relator finally contends that the condemnation proceedings were unauthorized because it was denied due process of law by the failure of § 99.430.1(8) to require notice to be given to relator that its property was included in an area that was the subject of an ordinance to declare the entire area to be blighted. Relator contends that a notice published in an obscure portion of a newspaper is not notice reasonably calculated to give affected property owners actual notice of the hearing on an ordinance to blight an area. *Dalton* considered a due process attack on the provi-

sion requiring notice of a hearing on the blighting ordinance. The Court held that the public hearing is purely a legislative hearing and there was no violation of due process for failure to give individual notice to property owners within the blighted area. The Court stated that it may be that the provision for hearing was inserted more for the benefit of the legislative body than for interested individuals. 270 S.W.2d at 56[9]. Relator argues however, that due process requires that notice should have been given to it under the holding in *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), and similar cases decided by the United States Supreme Court. In *Mennonite* the Court held "that prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment ..." a state must provide notice reasonably calculated to apprise interested parties of the pendency of the action and give them opportunity for objection. *Id.* at 795, 103 S.Ct. at 2709. Relator has not demonstrated how the passage of the blighting ordinance affected its property. No interference with relator's ownership, possession or use of its property results from passage of the ordinance. Relator argues only that if the legislature thought that notice should be given, due process requires such notice to be given to relator individually. In *Tierney* this Court held that "[t]he bare declaration of conditions found to exist in an area does not meet any accepted definition of 'taking.'" 742 S.W.2d at 154[15]. Since the adoption of the blighting ordinance was not a taking and relator does not demonstrate any way in which the passage of the ordinance affected its property, there is no due process requirement that relator be given individual notice of the hearings on the ordinance declaring the DWAR area to be blighted.

The preliminary order in prohibition is quashed.

All concur.