115 So.2d 745 (1959)
Phillip GRUBSTEIN, Appellant,
v.
URBAN RENEWAL AGENCY OF CITY OF TAMPA, Florida, a public body corporate and politic under the laws of the State of Florida, and City of Tampa, a Municipal Corporation under the laws of the State of Florida, Appellees.
Supreme Court of Florida.
November 18, 1959.
*746 John A. Chilldon, Tampa, for appellant.
Cody Fowler, George B. Foss, Jr., and Fowler, White, Gillen, Yancey & Humkey, Tampa, for appellee Urban Renewal Agency of City of Tampa.
Ralph A. Marsicano, Neil C. McMullen and H. Vincent Thornton, Tampa, for appellee City of Tampa.
ROBERTS, Justice.
This is an appeal from a decree sustaining the constitutionality of Ch. 57-1904, Laws of Florida, Special Acts of 1957, and the propriety of the Maryland Avenue Slum Clearance and Urban Renewal Project proposed to be undertaken by the defendants-appellees, the City of Tampa and the Urban Renewal Agency of the City of Tampa, pursuant to the statutory authority conferred thereby.
Ch. 57-1904, supra (the "Urban Renewal Law" hereafter), is a Special Act applicable only to the City of Tampa, providing for the clearing and redevelopment of slum and blighted areas legislatively declared to exist in the City. It is similar to slum clearance and urban redevelopment legislation adopted in a great many states, either with or without specific constitutional authority, and held valid in all but one of them, South Carolina. See Edens v. City of Columbia, 1956, 228 S.C. 563, 91 S.E.2d 280; cases collected in the annotation in 44 A.L.R.2d pp. 1414 et seq. Formerly held invalid in Georgia, such legislation has now been specifically authorized by an amendment to the Georgia Constitution adopted in 1954. See Bailey v. Housing Authority of City of Bainbridge, 1959, 214 Ga. 790, 107 S.E.2d 812. It is somewhat similar, also, to Ch. 23077, Laws of Florida, Acts of 1945, providing for the clearing and redevelopment of "blighted areas" by housing authorities in cities of not less than 60,000 population, which Act was held unconstitutional by this court in Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663.
Pursuant to the authority conferred by the Urban Renewal Law, supra, the City of Tampa has approved a plan for the clearance and redevelopment of a slum area within the City comprising some forty acres  the Maryland Avenue Slum Clearance and Urban Renewal Project. The redevelopment plan contemplates the replatting of the entire area and the laying out of an entirely new street plan, including the closing off of some existing streets. The area will be returned primarily to residential use, consistent with the residential areas adjoining the Project area to the North and West, and the remainder thereof will be devoted to neighborhood commercial uses necessary to serve the residents and to general commercial uses on two bordering main traffic arteries and light industrial uses along the bordering railroad right-of-way, already largely devoted to industrial uses.
The plaintiff owns property, alleged to be neither dilapidated nor run-down, within the Project area. In his suit to enjoin the defendants from proceeding with the Project, he attacked the Urban Renewal Law as violative of his right to acquire, possess and protect property, as an unauthorized taking of private property for private use, and as an unauthorized expenditure of public funds for private use and gain, contrary to the provisions of §§ 1 and 12, Declaration of Rights, §§ 5 and 10 of Article 9, and § 29 of Article 16, of the Florida Constitution, F.S.A.
*747 The able Chancellor heard the evidence on the issues made by the complaint and the defendants' answer thereto and entered a final decree upholding the validity of the Act and the propriety of the proposed Project plan as against the plaintiff's attack. His decree was based on the following findings of fact therein made:
"3. That the area in question is known as the Maryland Avenue Slum Clearance and Urban Renewal Project and covers an area of approximately 40 acres; that said area is made up of many small subdivisions, poorly planned and platted; that the great majority of buildings in this area are 50 to 70 years old and in a very dilapidated condition; that the great majority of residences are built to the property line with small and inadequate yards and the buildings are occupied by many families, oft-times a large family to each room in many houses; that said area is a slum or blighted area; that this slum area is a breeding place of disease and crime, and constitutes a menace to the health, safety, morals and general welfare of the City of Tampa and requires a disproportionate expenditure of public funds to preserve the public health and prevent crime, fire, accidents, and to supply public services to the residents of the area; that the tax income to the City, County and State is low and out of proportion to the amounts of public funds required to be expended in servicing the area; that nationally, where slums have been eradicated and the area redeveloped for the best purposes, the tax income accruing has been approximately seven times greater than when the area was a slum;
"4. That the police power of the City of Tampa is inadequate to accomplish the removal or elimination of the slum conditions found, and that the area is so far deteriorated as a slum or blighted section that mere conservation methods would not accomplish the elimination of slum conditions; and that the complete replatting and redevelopment of the land on an area-wide basis is the only feasible method of slum elimination in these circumstances;
"5. That private enterprise cannot accomplish the acquisition and redevelopment of the area in question to eliminate the blighted conditions therein, because of the diversity of ownerships and the inability of one or more private persons or organizations to obtain all parcels therein without the power of eminent domain; nor would such endeavor be profitable to private enterprise;
"6. That the proposed Maryland Avenue Slum Clearance and Urban Renewal Project will, if allowed to be carried through to its completion, fit into the City of Tampa's general plans of development, improve traffic and safety conditions in the area, eliminate the blighted area in question with its disease, crime, fire hazard, and other problems growing out of slum conditions, tie into the proposed system of limited access freeways through the City, reduce a disproportionate drain on the City's financial structure, provide an improved living and working environment within the City of Tampa, and will materially benefit, protect, and conserve the health, safety, morals and general welfare of all the citizens of the City;
"7. That the owners of property and interests therein within the area in question will be assured and protected despite the utilization of the power of eminent domain by the Urban Renewal Agency, because of the requirement that just compensation must be paid upon a taking of property by the Agency, following notice, hearing and the opportunity for a jury trial; * * *."
*748 The foregoing findings of fact are abundantly supported by the evidence adduced before the Chancellor and, in fact, are not here controverted by the plaintiff-appellant. Nor does he question the authority of the City to exercise the power of eminent domain in the eradication of slums and the evils attendant thereon. He contends here only that (1) the redevelopment provisions of the Act, under which the Agency may sell or lease the property in the Project area, after it has been cleared of the slum conditions, to private interests for private use and development "is for a private rather than a public use or purpose, even though such property may be located within an area designated as a `slum'", and thus invalid under the constitutional provisions mentioned above and the decision of this court in the Adams case, supra, 60 So.2d 663; and (2) that, in any event, the inclusion in the Project area of the property owned by him, which is neither dilapidated nor run-down, is a violation of his organic rights, supra.
His second contention may be quickly disposed of. If the Project plan, as a whole, is valid, then the inclusion therein of sound structures or vacant land does not necessarily invalidate the Project. This is so because the purpose of the Urban Renewal Law is to transform an entire slum area into a wholesome section of the community; and to deny to the City the right to include within the area certain houses or buildings in good condition would, in some instances, defeat the over-all purpose of the statute and the Project. Thus, it is universally held that if an area as a whole is subject to clearance and rehabilitation, the condition of a single structure located therein is immaterial. See Hunter v. Norfolk Redevelopment and Housing Authority, 1953, 195 Va. 326, 78 S.E.2d 893, 901; Wilson v. City of Long Branch, 1958, 27 N.J. 360, 142 A.2d 837, 847; Randolph v. Wilmington Housing Authority, Del. 1958, 139 A.2d 476, 484; Alanel Corp. v. Indianapolis Redevelopment Comm., Ind. 1958, 154 N.E.2d 515; State on Inf. of Dalton v. Land Clearance for Redevelopment Authority of Kansas City, 1954, 364 Mo. 974, 270 S.W.2d 44; St. Peter's Roman Catholic Parish v. Urban Redevelopment Authority of Pittsburgh, 1958, 394 Pa. 194, 146 A.2d 724. No contention is made that the City was guilty of bad faith or arbitrary action in adopting the Project plan here in question and in including therein the plaintiff's property. Cf. Bahr Corp. v. O'Brion, 1959, 146 Conn. 237, 149 A.2d 691. The Chancellor found that "the complete replatting and redevelopment of the land on an area-wide basis is the only feasible method of slum elimination"; and, in these circumstances, the plaintiff's contention in this respect cannot be sustained.
The plaintiff's first contention is not so easily resolved. We have, however, reconsidered the Adams decision, supra, 60 So.2d 663, relied upon by plaintiff, in the light of the record therein, and have concluded that, insofar as the provisions of the Urban Renewal Law relating to the clearance and redevelopment of slum areas, as therein defined, are concerned  and they are the only ones involved here, since the City's Project plan covers a slum area  the validity of the law may be upheld against the plaintiff's attack.
This is so because it is settled by the previous decisions of this court under the Housing Authorities Law, Ch. 17981, Laws of Florida, Acts of 1937 [Ch. 421, Fla. Stat., F.S.A.] that the power of eminent domain may be exercised in aid of the police power to clear slum areas and construct low-rental houses thereon, "thereby removing breeding places for crime and disease, and promoting the health, safety, morals, peace and general welfare of the people." Higbee v. Housing Authority of Jacksonville, 1940, 143 Fla. 560, 197 So. 479, 484. See also Marvin v. Housing Authority of Jacksonville, 1938, 133 Fla. 590, 183 So. 145, and Lott v. City of Orlando, 1940, 142 Fla. 338, 196 So. 313. The primary and fundamental purpose of the provisions of the Urban Renewal Law with which we are *749 here concerned is exactly the same: the clearance of slum areas and the redevelopment thereof so as to avoid a recurrence of the slum condition and the evils attendant thereon, and to promote the health, safety, morals, and general welfare of the citizens of the City of Tampa. In the one case the redevelopment is in the form of low-cost housing for low-income groups; in the other, it is in the form of private development. But the public purpose sought to be achieved is, in principle, identical.
Finding that the public purpose sought to be achieved by the Housing Law and the slum-clearance and redevelopment provisions of the Urban Renewal Law is, in principle, the same, we might well rest our decision on the previous decisions of this court upholding the validity of the Housing Authorities Law, cited above, since in those decisions no distinction was made between "public purpose" and "public use" as justification for the exercise of the power of eminent domain in aid of and as accessory to the exercise of the police power for such purpose. But even if we assume, arguendo, that "public purpose" is not enough and that a "public use", as defined by this court, must also be shown in order to justify the exercise of the power of eminent domain in aid of the police power, we do not find such a distinction between the ultimate use of the property to be made under the two Acts as to require a finding that the Housing Authorities Law contemplates a "public use" of the condemned property and the Urban Renewal Law does not.
It is true that, under the Housing Law, ownership of the cleared slum area and the houses constructed thereon remains for a time in a public agency, the Housing Authority. But, as indicated in Lott v. City of Orlando, supra, 196 So. 313, 314, "the low cost houses, under the provisions of the [Housing Authorities] Act, may be sold and the ownership and possession fall into private hands; * * *" And if a Housing Authority defaults on its financial obligations, the obligee may take possession of the housing project free from all the restrictions as to low-cost rentals and tenant selection imposed by the Housing Law. § 421.10, Fla. Stat., F.S.A. During the time that title and control of the housing project remains in the Housing Authority, the housing project itself is actually used by private persons  the low-income tenants for whose use the property was originally constructed. Under the Urban Renewal Law, a different type of redevelopment and use is permitted; and, instead of title being retained for an indefinite period in the Urban Renewal Agency as in the case of a Housing Authority, the title is immediately transferred to the purchaser for development according to the plans and specifications required under the Project plan.
In Demeter Land Co. v. Florida Public Service Co., 1930, 99 Fla. 954, 128 So. 402, 406, this court quoted with approval the following definition of "public use":
"A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain." Boyd v. C.C. Ritter Lumber Co., 119 Va. 348, 89 S.E. 273, 279, L.R.A. 1917A, 94.
And in Wilton v. St. Johns County, 1929, 98 Fla. 26, 123 So. 527, 533, 65 A.L.R. 488, in holding that the establishment of a public drainage system is a "public use" for which the power of eminent domain may be exercised, this court said that the use may be "local or limited, and yet be a public use," and that "if the main object for which land is taken is a public use, it obviously matters not that incidental benefit will inure to private individuals."
Manifestly, incidental benefits will inure to private individuals or corporations under *750 the Housing Authorities Law and the Urban Renewal Law. But in both, the use to be made of the condemned property is fixed and definite and control of such use is retained by the condemning authority; in both, slum clearance is the dominant or primary purpose of the enactment, and redevelopment of the cleared property is the subordinate purpose, linked to the primary purpose by the necessity of preventing the recurrence of the slum condition and of putting the property to some use. Thus, under both laws, the plan of slum clearance and redevelopment may be said to be for a "public use", under the definition quoted above. As stated in Randolph v. Wilmington Housing Authority, Del. 1958, 139 A.2d 476, 483:
"Control of the redevelopment designed to insure against a recurrence of the slums is provided for in furtherance of the primary purpose of the act, and to this limited extent public use of the land is continued after its sale to private developers." (Emphasis supplied.)
See also Crommett v. City of Portland, 1954, 150 Me. 217, 107 A.2d 841, 852; Nashville Housing Authority v. City of Nashville, 1951, 192 Tenn. 103, 237 S.W.2d 946, 950; Foeller v. Housing Authority of Portland, 1953, 198 Or. 205, 256 P.2d 752.
There remains, then, the question of whether the decision of this court in the Adams case, supra, 60 So.2d 663, requires a different ruling. As noted above, we have concluded that it does not.
The definition of "slum" made in the Housing Authorities Act is substantially similar to the definition of "slum area" made in the Urban Renewal Law; and, as previously indicated, this opinion is limited to the validity of the provisions of that Law relating to the clearance and redevelopment of slum areas as defined therein. On the other hand, the statute involved and stricken down in the Adams case, Ch. 23077, Acts of 1945, authorized the clearance and redevelopment of "blighted areas", the definition of which included, among others, areas which by reason of "excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community."
It is not clear to us how the quoted factors, singly or in combination, could have any direct relation to the public health, safety or welfare. They seem to reflect the idea that an area could be condemned and taken from the owners merely because the condemning authority was of the opinion that the area was not being used in the most efficient or economical manner, or was improperly or inartistically laid out, and sold to another so that it could be developed more efficiently. And for all that appears in the record in the Adams case, it was solely to apply the area in question to what was thought to be a more efficient use that the Project plan there considered was developed.
Reference to the record reveals that there was not one scintilla of evidence that the area was a breeding place for crime or disease; or that the condition of the area was such that it constituted a real hindrance to the redevelopment of the city and could not be eliminated or improved without resort to the power of eminent domain; or that the condition of the area menaced in any way the public health, safety, morals or welfare. The evidence adduced before the Chancellor was limited to a description of the condition of the 70 residences and four business structures in the area, the plan for relocation of the displaced residents, and the proposed redevelopment of the entire area for commercial and industrial purposes. This is in sharp contrast to the voluminous testimony adduced before the Chancellor in the instant case and reflected in his findings of fact, quoted above. It may, of course, be assumed that the Housing Authority of the City of Daytona Beach was of the opinion that the use of the area for those purposes would be more desirable in terms of economic, *751 architectural, or civic suitability; but we can see no justification for using the high prerogative power of eminent domain to seize one person's property to sell to another merely because, in the opinion of the condemning authority, another use would be more appropriate or desirable.
It can thus be seen that the real distinction between the statute and Project plan involved in the Adams case and those involved in the instant case lies in the purpose sought to be achieved thereby. There can be no doubt that the provisions of the Urban Renewal Law here in question have for their primary purpose the elimination of a slum condition, and prevention of the recurrence thereof, directly related and inimical to the public health, safety and welfare; and that the Project plan proposed to be carried out thereunder was designed to achieve such purposes. This is clearly shown by the findings of fact made by the Chancellor. Nor can it be doubted that these purposes and the use contemplated by the Urban Renewal provisions with which we are here concerned are a public purpose and use, under the Housing Authority and other decisions discussed above. But the statute involved in the Adams case authorized condemnation for, and  from all that is shown by the record  the Project plan developed thereunder was designed to accomplish, a purpose which might be beneficial to the public but which fell far short of being such a public purpose as to justify the exercise of the power of eminent domain. This court is committed to the rule that "public benefit" is not synonymous with "public purpose", when it comes to spending the taxpayers' money or taking his property by eminent domain, see State v. Town of North Miami, Fla. 1952, 59 So.2d 779; Lewis v. Peters, Fla. 1953, 66 So.2d 489, and that there must be some "reasonable" necessity for the exercise of the power of eminent domain, see Wilton v. St. Johns County, supra, 123 So. 527. It is abundantly clear that, while the public might be incidentally benefited by the Project plan proposed to be undertaken under the statute involved in the Adams case, it was not reasonably necessary to condemn the plaintiff's property in order to correct the substandard conditions existing in the area; and, in these circumstances, this court correctly held that the Project plan was invalid.
If the point had been raised  and if it could have been done consistently with the legislative intent  this court might have saved some portions of the Act stricken down in the Adams case, since it was necessary only to strike down the Project plan itself, for the reasons stated above. The point was not raised, however, and no useful purpose would be served by considering at this time the validity vel non of any portion of that Act. It suffices to say that in the Adams case the court was concerned with a sub-standard or "blighted" area, not shown to be reasonably necessary to take under the power of eminent domain to conserve the public health, safety, morals or general welfare; whereas, in the instant case we are concerned with the provisions of the Urban Renewal Law providing for the clearance and redevelopment of slum areas, and with a Project plan involving such an area, where a contrary finding was made. This being so, we do not consider the Adams decision as decisive here. Insofar, however, as the Adams decision may be in conflict with the opinions herein expressed, it is hereby modified to the extent of such conflict.
We repeat, for emphasis, that this decision is confined to the provisions of the Urban Renewal Law before us  those relating to slum clearance and redevelopment  and we express no opinion as to the validity of the provisions relating to the clearance and redevelopment of "blighted areas" as defined in the Urban Renewal Law.
For the reasons stated, the decree appealed from should be and it is hereby
Affirmed.
*752 TERRELL, J., concurs.
HOBSON and THORNAL, JJ., concur with opinion.
THOMAS, C.J., and DREW and O'CONNELL, JJ., dissent.
HOBSON, Justice (concurring specially).
I concur in the opinion prepared by Mr. Justice ROBERTS, and have no difficulty whatsoever in observing a crystal clear distinction between the case of Adams v. Housing Authority of City of Daytona Beach, Fla., 1952, 60 So.2d 663, and the instant suit. The purpose for which the Daytona Beach property, largely devoted to industrial uses, was sought to be condemned was not to rid that city of a "slum area" because it was a breeding place of disease and crime, and constituted a menace to the health, safety, morals and general welfare of the City of Daytona Beach but, on the contrary, to change an unsightly section into one more pleasing to the eye in order to appease the esthetic sense, of residents of that city, and that of the members of the condemning governmental authority  an end desirable but not essential.
In the present suit the purpose of condemning the property is, as has been correctly determined, to rid the City of Tampa of a "slum area" with all of its attendant evils in the interest of the common weal  the "summum bonum". The predominance of esthetic considerations  cloaked in the guise of general welfare  in the Adams case caused me to concur in the opinion prepared by the late Justice Mathews.
THORNAL, Justice (concurring).
I concur in the opinion and judgment prepared by Mr. Justice ROBERTS. I agree that there are many aspects of the instant case which distinguish it from Adams v. Housing Authority of City of Daytona Beach, Florida 1952, 60 So.2d 663. However, I would broaden the scope of our present holding by unequivocally receding from the judgment in the Adams case to the extent that it was there determined that Chapter 23077, Acts of 1945, was unconstitutional in its entirety. While, as effectively pointed out by Justice ROBERTS, the particular project contemplated in Adams might have been violative of the Constitution, it seems to me that the ultimate judgment was far too sweeping in its scope. I think it was totally unnecessary to hold Chapter 23077, supra, void in its entirety. In fact, it is my view that the project there could have been invalidated and the statute itself left intact.
Although I was not a member of the Court when the Adams case was decided, I would ordinarily consider myself bound by that judgment were it not for the propositions above pointed out as well as the reasons hereafter stated. I, therefore, deem it appropriate to record my own views while simultaneously concurring with the main opinion herein.
It should be recalled that Adams dealt with a specific, limited project which, admittedly, involved the condemnation of a relatively small area of land for immediate re-sale to private enterprise for the development of commercial establishments. It appeared to be an exploitation of governmental power for the benefit of selected individuals. Unlike the instant case, Adams did not involve extensive legislative and judicial findings of the existence of slum areas and the contemplated reconversion of those areas into low-cost residential properties. Here there is an over-all plan of re-development to get rid of slums and to replace them with living accommodations to meet the demands of the public for low-cost housing.
The Adams decision was in substantial measure grounded on State v. Town of North Miami, Florida 1952, 59 So.2d 779, which likewise involved the issuance of securities to raise money to acquire property through eminent domain, or otherwise, *753 and immediately to convey the property so acquired to a previously selected private manufacturing concern. If any public purpose was involved it was a mere incident to the accomplishment of the private objective.
The Adams case has been followed in two subsequent decisions. In Lewis v. Peters, Fla. 1953, 66 So.2d 489, we held that the Housing Authority of Panama City could not enter into an arrangement with private persons for the leasing of public land to be used in the construction of housing accommodations for naval personnel. This case in no respect involved the demanding necessity of eliminating a slum area with the ultimate objective of replacing the eliminated structures with reasonably adequate housing facilities for those who would otherwise be slum dwellers.
The other decision which has followed Adams is City of Clearwater v. Caldwell, Fla. 1954, 75 So.2d 765. This case was almost identical with State v. Town of North Miami, supra, inasmuch as the city undertook to lease publicly owned property to private parties for the purpose of enabling the latter to operate a hotel business as a private enterprise. None of the underlying aspects of public use which are present in the case at bar were even remotely present in City of Clearwater v. Caldwell, supra.
In addition to the several cases mentioned above, appellant relies upon Edens v. City of Columbia, 1956, 228 S.C. 563, 91 S.E.2d 280. So far as our research disclosed the Supreme Court of South Carolina is the only court of a sister state which now has views harmonizing with those expressed in the Adams decision.
Appellant also relies on Schneider v. District of Columbia, D.C., 117 F. Supp. 705. We can hardly visualize Schneider as being of any comfort to the appellant. This is so because in the cited decision a three-judge Federal Court upheld a redevelopment program for the District of Columbia subject to a restriction against the acquisition of a buffer strip surrounding the development. Moreover, on appeal the Supreme Court of the United States in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27, affirmed the ruling of the District Court and even modified its judgment by eliminating the restriction imposed by that Court.
It appears to me that this Court itself, by decisions subsequent to Adams, has not only greatly restricted the scope of that judgment but also has in substantial effect receded from its comprehensive sweep. This in turn leads me to feel some justification for my own conclusion that we should now clearly and realistically limit the Adams judgment and present it in its proper perspective. There is precedent here for the proposition that the broad sweep of a decision construing the Constitution can be so restricted by exceptions over the years that the original decision becomes of no further value and should be specifically discarded. This process of gradual recession resulting in the ultimate discard of an earlier decision was recognized by this Court in City of Orlando v. State, Fla. 1953, 67 So.2d 673, wherein it was held that an earlier application of Section 6, Article IX, Florida Constitution, was no longer of real force and effect because of gradual changes in the original rule through subsequent decisions. Let us now examine a few of the later cases which have sharply curtailed the authority of Adams.
In State v. Dade County, Fla. 1953, 62 So.2d 404, we held that the Dade County Port Authority could issue revenue certificates to raise money to construct a large warehouse and overhaul shop to be immediately leased to an airline. In Gate City Garage v. Jacksonville, Fla. 1953, 66 So.2d 653, it was held that a municipality could acquire land for an off-street parking facility and in turn lease a part of the area to private enterprise for the operation of a service station. This decision appears to me to support the rule which I feel is sound. If the primary objective to be accomplished *754 by a proposal is public and for the public use, then the fact that some private enterprise might benefit as an incident is of no consequence. It is simply my view here that the elimination of slum areas is in and of itself a "public use" which may be accomplished through the exercise of the power of eminent domain. If it becomes necessary to employ the capital and facilities of private enterprise to eradicate the filth, the misery, the disease and the vice of those decadent areas called "slums", I cannot be led to fear that the public objective necessarily loses its identity in the process.
Again, in State v. Board of Control, Fla. 1953, 66 So.2d 209, this Court held that the Board of Control could issue revenue certificates for the purpose of building "dormitories", which by another name were merely fraternity houses to be immediately leased to fraternities for living accommodations for their members at the University of Florida.
This Court pointed out that an incidental private benefit is not determinative of the validity of a proposal if the ultimate basic objective is a public use.
I agree with Justice ROBERTS, as he so ably emphasizes, that beyond all measure of doubt in the case before us the objective to be accomplished is the elimination of an area which is indisputably slum infested and burdened with all of the evil conditions attendant upon such communities. I do not overlook the proposition that the immediate appellant owns property which in isolation might not be condemnable as slum property. The answer to this is simply that in assembling the land essential to the re-development, it has been determined that the program must necessarily comprehend an "area". It is the cleansing of the area as a composite unit of land that makes it possible to re-develop the "area", not only for the benefit of those who would otherwise be slum dwellers, as pointed out in the main opinion, but also for the benefit of the community as a whole. Berman v. Parker, supra.
In Sunny Isles Fishing Pier v. Dade County, Fla. 1955, 79 So.2d 667, this Court approved the leasing of a publicly owned fishing pier to a private enterprise for development by private capital. The pier was located in a public recreation area and it was held that private benefit was merely incidental to the public purpose, to wit: recreation.
In State v. Inter American Center Authority, Fla. 1955, 84 So.2d 9, we unanimously agreed that a public agency could issue revenue certificates to raise money to construct a trade center which would be leased to concessionaires and other lessees as a part of a program to encourage international trade. In State v. Daytona Beach Racing and Recreational Facilities District, Fla. 1956, 89 So.2d 34, we again resisted the contention that ultimately a private enterprise would benefit from the public facility. In this case we held that a public recreation district could issue bonds and construct a speedway which would be leased to a private enterprise for six months out of each year for a period of forty years. We here recognized the importance of recreation and entertainment to the economy of a tourist state such as Florida. Again we adhered to the rule that the public use or purpose to be accomplished was the provision of recreation and entertainment facilities. This we considered to be the main objective of the proposal and the forty-year lease to a privately owned speedway association for the operation of stock car races, at a profit to the promoters was in our view, merely incidental. It appears to me that the elimination of slums and breeding places of mental, moral and physical delinquencies is as essential to the ultimate welfare of a people as is the provision of an automobile racetrack to be employed as an attraction to visitors in the interest of the economic well-being of the community.
In Panama City v. State, Fla. 1957, 93 So.2d 608, we upheld the power of the City *755 of Panama City to issue revenue bonds to construct an extensive waterfront development despite the contention that a part of the project would be leased to private enterprise for its own profit. Here again we announced our established position that if the private benefit is merely incidental to the overall accomplishment of the public use then the existence of the former will not be recognized as a reason to prevent the accomplishment of the latter.
In Hanna v. Sunrise Recreation, Fla. 1957, 94 So.2d 597, we upheld the authority of the Florida Board of Parks and Historical Memorials to lease substantial areas in a public park to a private enterprise for the conduct of an eighteen hole golf course, restaurant, swimming pool and related activities. The public use being recreation we held that the employment of private facilities to accomplish that use did no violence to the Constitution.
Finally, in State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346, it appears to me that this Court for all practical purposes, tolled the tocsin that sounded the death knell of the judgment in Adams v. Daytona Beach Housing Authority, supra. In Cotney we simply held that the Clay County Development Authority, operating pursuant to a special act, could acquire land for low-cost housing and ultimately accomplish the construction of the buildings through agreements with private interests. While the statute did not authorize the Authority to exercise the power of eminent domain, this appears to me to be of little consequence in view of the fact that the public Authority proposed to raise money to acquire the land which in turn would be transferred to private enterprise for development. Insofar as the application of Section 10, Article IX of the Florida Constitution is concerned I can see little difference between the situation presented by State ex rel. Ervin v. Cotney, supra, and the situation presented by the case at bar. In both instances the public credit was employed to acquire the land to be used for subsequent development by private enterprise in fulfillment of the public objective.
It appears to me that since the original decision in Adams v. Daytona Beach Housing Authority, supra, this Court has steadily but consistently "whittled away" at the comprehensive scope of that decision. This has been done to the point where the Adams judgment is nothing more than a disposition of the particular project proposed in that immediate case. I think the time has arrived to make it crystal clear that it amounted to no more.
The Adams decision has also been subjected to rather severe criticism in law reviews and by decision of numerous courts of sister states, of which the following are typical: 6 F.L.R. 280, 312 and 429; 12 F.L.R. 45; 10 M.L.Q. 161; 25 Ch.L. 313; 101 U. of Pa.L.R. 411; 39 Va.L.R. 236; Velishka v. Nashua, 99 N.H. 161, 106 A.2d 571, 574, 44 A.L.R.2d 1406; Redevelopment Agency, etc., v. Hayes, 1954, 122 Cal. App.2d 777, 266 P.2d 105; Gohld Realty Co. v. City of Hartford, 1954, 141 Conn. 135, 104 A.2d 365; Papadinis v. City of Somerville, 1954, 331 Mass. 627, 121 N.E.2d 714; Crommett v. City of Portland, 1954, 150 Me. 217, 107 A.2d 841; State on Inf. of Dalton v. Land Clearance for Redevelopment Auth., 1954, 364 Mo. 974, 270 S.W.2d 44; State ex rel. Bruestle v. Rich, Ohio 1953, 159 Ohio St. 13, 110 N.E.2d 778; Foeller v. Housing Authority of Portland, 1953, 198 Or. 205, 256 P.2d 752; Hunter v. Norfolk Redevelopment and Housing Authority, 1953, 195 Va. 326, 78 S.E.2d 893; Davis v. City of Lubbock, Tex. 1959, 326 S.W.2d 699.
I, therefore, concur in the opinion prepared by Mr. Justice ROBERTS, and for the reasons stated by him, as well as the foregoing, I would affirm the decree of the Chancellor.
DREW, Justice (dissenting).
In the concluding paragraphs in Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663, 670, this *756 Court, in construing an act of the Legislature to all intents and purposes identical to the one now under consideration, solemnly declared that the act there under consideration "violates the Constitution of the State of Florida in the following particulars:
"(1) Section 1 of the Declaration of Rights in that the inalienable right of the citizen to acquire, possess and protect property would be denied; public authorities would be permitted to take one man's property against his will and make it available to another group for their private purpose rather than a public use,
"(2) Section 12 of the Declaration of Rights and Section 29 of Article XVI in that the taking of private property for a purpose or use not public, to wit, for the purpose of selling or leasing the same for private use, profit and gain to other individuals, corporations or associations is attempted to be authorized and consummated,
"(3) Section 5 of Article IX in that the expenditure of public funds and the assessment and imposition of taxes for a purpose not public nor municipal would be authorized,
"(4) Section 10 of Article IX in that an attempt is made to authorize and consummate the appropriation of public or municipal funds or money, or the loaning of credit of a municipality to corporations, associations, institutions, or individuals for a purpose not public nor municipal and for private gain and profit."
Events, legislative and otherwise, which have occurred in the years following the decision in the Adams case, as recited in the dissenting opinion of Mr. Justice O'CONNELL, with which I agree, convince me beyond any doubt that the people and their representatives have been of the opinion that the Constitution of this State, as interpreted by this Court, prohibited the undertakings and activities by the government in the manner described in the record in this cause. When the Constitution has thus been interpreted by this Court, I hold the view that only the people may change it and then only in the manner prescribed by the Constitution itself. We are bound, as are the other branches of government, by the chains of the Constitution. More than 150 years ago, in his farewell address, George Washington very appropriately observed:
"The spirit of encroachment tends to consolidate the powers of all the departments into one and this creates a real despotism. A just estimate of that love of power, and proneness to abuse it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power has been evinced by experiments ancient and modern, some of them in our own country and under our own eyes. Let there be no change by usurpation. It is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance  in permanent evil  any partial or transient benefit which the use can at any time yield."
For these reasons, therefore, I respectfully dissent.
THOMAS, C.J., and O'CONNELL, J., concur.
O'CONNELL, Justice (dissenting).
I have meticulously compared the record in this cause with that in the case of Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663 and am unable to find any material difference in the legal questions involved in the two cases which will allow a different result in this cause unless this Court recede from the holding in the Adams case.
The act involved in the Adams case authorized the housing authority "to acquire *757 blighted areas * * * (including slum areas)" clear and redevelop them, while Ch. 57-1904, the act involved in the case before us, provides for the "rehabilitation, clearance, and redevelopment of slums and blighted areas." Both acts clearly seek to provide the same means of removing slums and blighted areas which constitute a danger to the public health, safety, morals and welfare of the communities involved. Both refer throughout to slums and blighted areas. Both acts provide the same general scheme of accomplishing the intended results. Both provide for use of city funds as supplemented by federal funds, both provide for acquisition of the land and buildings within the blighted or slum area by purchase or by use of the power of eminent domain, both provide that after acquisition the authority may retain the lands for public use or dispose of same by sale or lease to private enterprise subject to a redevelopment plan, and both statutes required findings by local governments of the existence of slum or blighted areas in the city and that removal thereof was necessary for the public welfare, health, safety and morals of the residents of the city.
While there is considerable difference in the size of the two areas, that in the Adams case being approximately six acres while that in the present case involves approximately forty acres, there is no difference in the legal principles involved and little difference in the condition of the areas justifying their classification as blighted as opposed to slum areas. Further, as I see it, the question of whether the areas in either case were or were not "slum" or "blighted" areas was never raised either in the trial court or before this Court and therefore was not an issue to be judicially determined in either case. In both the Adams case and in this one the plaintiff property holder contended only that he owned improved property in the area which was not dilapidated or faulty so as to contribute to the slum or blighted condition and that it should not be condemned. For this reason it seems to me to be immaterial that in the case now before us, as pointed out in the opinion by ROBERTS, J., more evidence was offered to prove that the area involved was a slum area and how such area affected the safety, health, morals, or welfare of the community, than was submitted in the Adams case.
Nor can I see any distinction between the Adams case and the present case on basis of the difference in the proposed use of the land after the areas are cleared of the dilapidated improvements, as is sought to be made in the opinion by ROBERTS, J. In the Adams case the redevelopment plan called for use only for commercial and industrial purposes. In the present case the redevelopment plan provides for use of the land for a combination of residential, commercial and light industrial. In addition a junior high school, the city stockade, several churches and social clubs all presently located within the slum area will remain and continue to be used as such.
Equally pertinent, on this point, if the majority opinion is correct in its holding that the primary purpose of the Urban Renewal Law is the elimination of a slum condition and prevention of its recurrence, it must follow that the elimination and prevention of recurrence of the slum is the "public purpose", and the only one which will under that opinion justify the use of public funds and exercise of the power of eminent domain. If this reasoning be correct it matters not whether the subsequent use be for residential, commercial or other purposes so long as it is so planned as to prevent a recurrence of slum or blighted conditions. In fact it would appear reasonable that there would be greater possibility of prevention of recurrence of a slum condition under the Adams case where residential use was excluded under the proposed plan, than under the present case where I get the view that the present slum dwellers or other low income families will ultimately be returned to the same areas. It cannot be expected that all the social ills of *758 such unfortunate people can be cured solely by changing the physical surroundings in which they live.
In both the Adams case and this one the authority proposed to make certain site improvements at public expense, but the record reveals that those to be made under the plan involved in this case were far more extensive than in the Adams case.
In both cases the land was, or is, to be leased or sold to private enterprise at less than the total cost thereof, including the cost of site improvements and clearing, to the authority. The loss sustained by the public, by so subsidizing the private interests who purchase or lease the land, would be shared about one-third by the city and two-thirds by the federal government.
In view of the foregoing similar, if not identical circumstances, factual and legal, existing in this case and in the Adams case I am compelled to conclude that despite the magnificent effort of Mr. Justice ROBERTS to distinguish the two cases it is impossible to do so.
Therefore the basic question, as I see it, is whether the Adams case is precedent to be followed under the doctrine of stare decisis, or is to be receded from in favor of other views.
I have concluded, that insofar as I am concerned, the decision in the Adams case is binding upon this Court and should be adhered to.
A constitutional provision is intended to be a continuing instrument of government. Nevertheless, its meaning is fixed when the people adopt it. It does not attract a different meaning at a subsequent time, nor should its meaning change with the varying tides of public opinion and desire.
The fact that situations, such as those present in the instant case, were not anticipated when the constitution was adopted does not mean that it should be given a different meaning when applied to the new conditions. A constitution must be ambulatory and interpreted with sufficient flexibility to make it applicable to new situations, but as it operates on new situations and conditions it must be given the same meaning and intent which it had when adopted. Its flexibility must never be achieved at the expense of maintaining uniformity in its use and construction.
Faced with these legal principles regarding the nature of constitutions and their provisions we must consider the application of the doctrine of stare decisis.
I recognize fully that the doctrine of stare decisis is not an immovable barrier to change in judicial decisions. Yet without question the doctrine finds and deserves its most rigid application in the construction of written constitutions and statutes.
A fundamental rule in construction of constitutional provisions is that they should receive a consistent and uniform interpretation and a court must not allow the facts of a particular case to influence its decision so as to render a new construction even though the circumstances may seem to make a new and different rule seem more desirable. Certainly similar statutes should not be construed as constitutional in one case and unconstitutional in another involving decidedly similar circumstances, as will be the result of the majority opinion in this case.
Uniformity and consistency in interpretation of meaning is best achieved by application of a rule of stare decisis. It is through use of this rule that courts are caused to exercise the all important judicial restraint necessary to give the stability in government and law which written constitutions and laws are designed to achieve.
As I understand the effect of a decision of this Court interpreting the meaning and effect of a provision of our constitution, it is that our decision becomes a part of the constitutional provision itself and should remain there until the people themselves change it.
*759 On this point it is significant and of great importance to note that in the Adams case the mandate of this Court was issued in October 1952 and that four regular and several special sessions of the state legislature have been held since that time. Further, we can take judicial notice of the fact that in one or more of those sessions the effect of the decision in the Adams case on proposed urban renewal has been recognized, attacked and defended and constitutional amendments have been proposed to change its effect but the legislature has refused to act favorably on them. The obvious conclusion is that the people have acquiesced in that decision and have elected not to change it and I hold that we should not by judicial fiat do what the people acting through their elected representatives have determined not to do.
It is such action of other courts in our nation that has thrust upon us a dilemma and created a turmoil, involving the proper role of courts as opposed to lawmaking bodies, that have done untold damage to courts everywhere in our land and caused doubt that courts do or should have the ultimate power to determine the validity of statutes and meaning and application of constitutional provisions.
It is my view that the matter now before us was settled in the Adams case and is not therefore open to decision by this Court, it being for the legislature and the people to change the pertinent provisions of the constitution if they desire to do so.
I have not ignored the reason and logic of Mr. Justice THORNAL'S special concurring opinion in which he points out that this Court has by its decisions, issued subsequent to the Adams case, interstitially changed the interpretation of the provisions of our constitution relating to use of public funds. And I must admit, unhappily, that we have gone a long way afield in permitting use of public funds for objects which do not square with the basic principles of our government. As a result governmental agencies have invaded fields of endeavor where once it was agreed they should not walk. Perhaps the decision of this Court in City of West Palm Beach v. State, Fla. 1959, 113 So.2d 374 is indicative of a return to a more strict interpretation of public use and public purpose insofar as use of public funds is concerned.
Further, irrespective of the uses which have been permitted to be made of public funds, I feel to be vastly more important the subject of the use of the power of eminent domain, as that question is involved in both the Adams and present case. Conceding for sake of argument that we have departed from the Adams case, insofar as use of public funds is concerned, I am unable to agree that we have done so insofar as use of the power of eminent domain for the purpose involved in this case and feel that such decision should be followed in this case on that ground, if on no other.
I should make it clear in conclusion that I feel clearance of slum and blighted areas to be laudable and desirable. Further, it is not difficult to understand that such can be done more efficiently, more completely, and more quickly through the plans proposed to be used in this case and in the Adams case than through use of the police power. I feel too that the provision of the plan which results in the return of the property involved to private use is much more desirable than continued ownership thereof by a governmental agency as a housing development or project.
Nevertheless, approval of the result sought to be achieved is not sufficient, in my mind, to overcome the constitutional barriers erected thereto by the people of this state.
Therefore, for the reasons above expressed, I must respectfully dissent.
THOMAS, C.J., and DREW, J., concur.