349 So.2d 155 (1977)
DESERET RANCHES OF FLORIDA, INC., Appellant,
v.
Dorothy BOWMAN, Etc., et al., Appellees.
No. 49241.
Supreme Court of Florida.
April 21, 1977.
Rehearing Denied September 6, 1977.
Philip W. Watson and George T. Eidson, Jr., of Akerman, Senterfitt & Eidson, Orlando, for appellant.
Bruce E. Chapin, Orlando, for appellees.
BOYD, Justice.
In December 1975 Dorothy Bowman and other trustees of a certain trust filed a complaint in the Circuit Court, Ninth Judicial Circuit, in and for Osceola County, against Deseret Ranches of Florida, Inc. Among the types of relief sought was establishment of a way of necessity pursuant to Section 704.01(2), Florida Statutes:
"(2) Statutory way of necessity exclusive of common law right.  Based on public policy, convenience, and necessity, a statutory way of necessity exclusive of any common law right exists when any land or portion thereof outside any municipality which is being used or desired to be used as a dwelling or for agricultural or for timber raising or cutting or stockraising purposes shall be shut off or hemmed in by lands, fencing, or other improvements of other persons so that no practicable route of egress or ingress shall be available therefrom to the nearest practicable public or private road. The owner or tenant thereof, or anyone in their behalf, lawfully may use and maintain an easement for persons, vehicles, stock, and electricity and telephone service over and upon the lands which lie between the said shut-off or hemmed-in lands and such public or private road by means of the nearest practical route, considering the use to which said lands are being put; and the use thereof, as aforesaid, shall not constitute a trespass; nor shall the party thus using the same be liable in damages for the use thereof; provided that such easement shall be used only in an orderly and proper manner."
The complaint alleged that plaintiffs owned real property which was surrounded by land owned by the defendant and that no route of ingress or egress was available from their land to the nearest public or private road. Alleging further requirements necessary to establish a cause of action under the statute, Count II of the complaint requested that the court establish a statutory way of necessity over the land of Deseret Ranches to provide access to the nearest road.
Deseret Ranches moved to dismiss Count II of the complaint on the ground that the statute is unconstitutional. The court denied the motion and in so doing directly *156 passed on the constitutional validity of the statute. The interlocutory order was appealed by Deseret Ranches to this Court. The appeal is treated as a petition for certiorari.[1] We have jurisdiction.[2]
Appellant's only meritorious argument[3] against the statute's constitutional validity is that it violates Article X, Section 6(a) of the Florida Constitution (1968):
"SECTION 6. Eminent domain. 
"(a) No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner."
The argument is that in contravention of the foregoing provision no purpose which is predominantly public is served by the taking of easements through operation of the statute. Although it is conceded that the statute provides a public benefit, it is argued that the benefit is incidental to a purpose which is predominantly private, that purpose being to provide a private land owner with conventional access to the outside world.
In 1961, before the adoption of the Florida Constitution of 1968, there was advanced in Stein v. Darby[4] a similar argument against the statute, cast in terms of unconstitutionality under both the Florida Constitution of 1885 and the Fourteenth Amendment to the United States Constitution. After an excellent review of the common law history of the doctrine of ways of necessity, the Court concluded that the doctrine is grounded in the public policy against the loss of the use of landlocked property. As to the statutes' provision for ways of necessity, Stein stated,
"... we find no logic in the argument that the statute in question, which aids to render the earth  from which all sustenance flows  available to the uses of man, is unconstitutional as serving something other than a public purpose." 126 So.2d at 320.
Appellant contends that the intervening adoption of the 1968 Florida Constitution, including Article X, Section 6(a) and its "public purpose" requirement, mandates a different result from that reached in Stein and, Article X, Section 6(a) aside, that Stein was wrongly decided.
We agree with the reasoning in Stein and hold the statute constitutional under the present Constitution. The inverse of appellant's contention is true: the statute's purpose is predominantly public and the benefit to the private landholder is incidental to the public purpose. Although state public policy may have altered with respect to the methods of land use since 1961,[5] sensible utilization of land continues to be one of our most important goals. We take notice that Florida grows in population at one of the fastest rates of any state in the nation. Useful land becomes more scarce in proportion to population increase, and the problem in this state becomes greater as tourism, commerce and the need for housing and agricultural goods grow. By its application to shut-off lands to be used for housing, agriculture, timber production and stockraising, the statute is designed to fill these needs. There is then a clear public purpose in providing means of access to such lands so that they might be utilized in the enumerated *157 ways. The statute therefore is in keeping with Article X, Section 6(a), Florida Constitution.
Certiorari is denied.
It is so ordered.
OVERTON, C.J., and ADKINS, HATCHETT and DREW (retired), JJ., concur.
SUNDBERG, J., dissents with an opinion, with which ENGLAND, J., concurs.
SUNDBERG, Justice, dissenting.
I must respectfully dissent from the majority opinion which upholds as nonviolative of Article X, Section 6(a), Florida Constitution of 1968, the provisions of Section 704.01(2), Florida Statutes (1975). Article X, Section 6(a), is a brief restatement of Article XVI, Section 29, and the Declaration of Rights, Section 12, Florida Constitution of 1885. See commentary to Article X, Section 6, 26A Florida Statutes Ann. 479. The conditions of both the former and current constitutional mandates are the same. No private property shall be taken "except (i) for a public purpose (ii) and with full compensation therefor paid to each owner." There can be no doubt that the condition of full compensation is met by the statute in question. Section 704.04, Florida Statutes (1975), provides a judicial remedy and compensation to the servient owner when Section 704.01(2) is invoked. My colleagues and I depart on the question of whether the condition of "public purpose" is satisfied by Section 704.01(2). I am firmly convinced that it is not.
It should be noted at the outset that Section 704.01, Florida Statutes (1975), recognizes two types of ways of necessity. By Section 704.01(1), the common law rule of an implied grant of a way of necessity is "recognized, specifically adopted, and clarified." As pointed out in Stein v. Darby, 126 So.2d 313 (Fla. 1st DCA 1961), such a way of necessity is historically grounded in real property law concepts. No taking of the land of another is involved because an implied grant of the right-of-way is presumed from the conveyance by the common grantor. It is a right inuring in the estate of the grantee which arises at the time of the conveyance by the common grantor. Principles of eminent domain are not applicable.
However, it is clear from the very title of Section 704.01(2), Florida Statutes (1975), that the statutorily created way of necessity is exclusive of the common law right with no necessity to establish the elements essential to application of the common law rule. It is a delegation by the legislature to private individuals of the sovereign power of the state to exercise eminent domain over the lands of other private individuals. Of course, delegation of the power of eminent domain by the legislature in not unique. Counties and municipalities enjoy such a grant (§ 127.01, Fla. Stat. (1975)) as do quasi-public corporations such as railroad, electric power, gas, and telephone and telegraph companies. See Chapters 360, 361, 362, Florida Statutes (1975). More recently districts and authorities which engage in drainage, flood control, water management, public housing and urban renewal activities, have been properly delegated the power of eminent domain where it is apparent that such activities serve a public as opposed to a private purpose. See Chapters 361, 373, Sections 163.375, 180.22, 298.62, 421.08(3), Florida Statutes (1975). Nonetheless, the test always has been whether or not the purpose of such taking is public or at least primarily public. The public purpose must not be merely incidental, and "public benefit" is not synonymous with "public purpose." Grubstein v. Urban Renewal Agency of City of Tampa, 115 So.2d 745 (Fla. 1959); Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952). On the other hand, incidental private benefit will not be fatal to a proposal if the ultimate, basic objective is a public use. State v. Board of Control, 66 So.2d 209 (Fla. 1953).
Grubstein, supra, was heavily relied upon by the District Court of Appeal in Stein v. Darby, supra. Grubstein held valid a special *158 act of the legislature[1] providing for the rehabilitation, clearance, and redevelopment of slums and blighted areas in the City of Tampa in accordance with urban renewal plans. The act authorized exercise of the power of eminent domain by the City to accomplish its purposes and permitted lease or sale of property so acquired to private interests in furtherance of the plan of redevelopment. In holding the act constitutional against an assertion that it violated the predecessor to Article X, Section 6(a), Constitution of Florida, the Court opined that, as under the Housing Authority Law, "slum clearance is the dominant or primary purpose of the enactment, and redevelopment of the cleared property [through sale or lease to private interests] is the subordinate purpose, linked to the primary purpose by the necessity of preventing the recurrence of the slum condition and of putting the property to some use." 115 So.2d 745 at 750. That clearance of slum areas was the dominant purpose of the act was borne out by quoted findings of the trial court:
... that this slum area is a breeding place of disease and crime, and constitutes a menace to the health, safety, morals and general welfare of the City of Tampa and requires a disproportionate expenditure of public funds to preserve the public health and prevent crime, fire, accidents, and to supply public services to the residents of the area; that the tax income to the City, County and State is low and out of proportion to the amounts of public funds required to be expended in servicing the area; that nationally, where slums have been eradicated and the area redeveloped for the best purposes, the tax income accruing has been approximately seven times greater than when the area was a slum;
4. That the police power of the City of Tampa is inadequate to accomplish the removal or elimination of the slum conditions found, and that the area is so far deteriorated as a slum or blighted section that mere conservation methods would not accomplish the elimination of slum conditions; and that the complete replatting and redevelopment of the land on an area-wide basis is the only feasible method of slum elimination in these circumstances;
* * * * * *
6. That the proposed Maryland Avenue Slum Clearance and Urban Renewal Project will, if allowed to be carried through to its completion, fit into the City of Tampa's general plans of development, improve traffic and safety conditions in the area, eliminate the blighted area in question with its disease, crime, fire hazard, and other problems growing out of slum conditions, tie into the proposed system of limited access freeways through the City, reduce a disproportionate drain on the City's financial structure, provide an improved living and working environment within the City of Tampa, and will materially benefit, protect, and conserve the health, safety, morals and general welfare of all the citizens of the City... . Id. at 747.
In the instant case there is no showing of any dominant public purpose to be served through the operation of Section 704.01(2), Florida Statutes (1975). Its dominant or main purpose is to serve the interests of a landlocked private landowner. Any ancillary benefit to the public through development of undeveloped land in this State is just that  a "public benefit" and not a "public purpose". The assertion in the statute that it is "[b]ased on public policy, convenience, and necessity" is not the equivalent of "public purpose" which is the sine qua non of Article X, Section 6(a) of our Constitution.
Furthermore, I am unwilling to discard South Dade Farms v. B. & L. Farms Co., 62 So.2d 350 (Fla. 1950), as being without precedential value on the subject at hand, as does the majority in footnote 3 to the opinion. The majority categorically concludes without analysis that the absence of a requirement *159 of compensation to the servient owner was the only impediment to the predecessor of Section 704.01(2) found in South Dade Farms. They maintain that this deficiency was cured by the amendment adding Section 704.04, Florida Statutes (1975). Review of a portion of the Court's opinion in South Dade Farms is instructive on this point:
Of course, in this instance the taking would have no semblance even of basis in the police power. It is purely a matter of taking from one private owner for the use of another private owner.
When the state attempted, by the statute, to accomplish what would result were the present order enforced, its act constituted a violation of the provision that no state shall "deprive any person of * * * property, without due process of law * * *." Also the Florida constitutional provisions found in the Declaration of Rights that a person shall not "be deprived of * * * property without due process of law * * *" would be violated, not to mention the provision that private property shall not be "taken without just compensation." (Emphasis added). Id. at 351.
Section 12 of the Declaration of Rights provided in pertinent part:
No person [i] shall ... be deprived of life, liberty, or property without due process of law; [ii] nor shall private property be taken without just compensation.
It is crystal clear to me that this Court determined that the predecessor of Section 704.01(2), Florida Statutes (1975), violated both conditions limiting exercise of the power of eminent domain, i.e., (1) the taking must be for a public purpose, and (2) just compensation must be paid for that which is taken. Section 704.04, Florida Statutes (1975), may be an elixir for the latter, but it is no cure for the former. Consequently, the principles of stare decisis dictate the result in this case absent any reason to recede from South Dade Farms and none has been demonstrated.
At a time in history when attention has been focused, quite properly, on the protection of civil rights, we must not lose sight of the fact that the fundamental document expressing the organic law of this state and the nation accords no less dignity to the protection of property rights. Enunciated as one of the "basic" and "inalienable" rights by our present Constitution is the right "to acquire, possess and protect property." Article I, Section 2, Florida Constitution. It is an odious concept indeed that the awesome eminent domain power of the sovereign may be utilized by an individual to take for his own private use the private land of his neighbor against the will of the neighbor regardless of the requirement that full compensation shall be paid. It is no consolation to assert that the right-of-way easement is temporary and shall exist only so long as it is reasonably necessary for the purposes stated in the statute. If Section 704.01(2), Florida Statutes, is held not to violate Article X, Section 6(a), then there can be no rational basis to restrict the power of the legislature to delegate the authority to take permanently.
Mindful as I am of the presumption of validity which accompanies a solemn act of the legislature when it comes to this Court under attack, nonetheless I cannot square the operation of Section 704.01(2) with the constitutional guarantees of Article I, Section 2, and Article X, Section 6(a). Accordingly, I would declare the statute unconstitutional, grant the writ of certiorari, and reverse the order of the trial court.
ENGLAND, J., concurs.
NOTES
[1] Burnsed v. Seaboard Coastline RR., 290 So.2d 13 (Fla. 1974).
[2] The Supreme Court "May review by certiorari ... any interlocutory order passing upon a matter which upon final judgment would be directly appealable to the supreme court...." Art. V, § 3(b)(3), Fla. Const.
[3] Arguments that the statute works a denial of property without due process of law are without merit. Section 704.04, Florida Statutes, provides for judicial remedy if the servient owner objects to a claim under Section 704.01(2). The objections to statutory easements of Section 704.01 voiced by this Court in South Dade Farms v. BSL Farms Co., 62 So.2d 350 (Fla. 1950), have also been cured by the enactment of Section 704.04, Florida Statutes, since it provides for compensation to the servient owner if the court finds the statutory claim to exist.
[4] 126 So.2d 313 (Fla. 1st DCA 1961).
[5] Witness Article II, Section 11, Florida Constitution, and the many enactments of environmental legislation by the Florida Legislature.
[1] Ch. 57-1904, Laws of Fla., Special Acts of 1957.